[Crim. No. 5634. Second Dist., Div. Two. Dec. 28, 1956.]

THE PEOPLE, Respondent, v. HARRY THOMAS COMSTOCK, Appellant.

Simpson, Wise & Kilpatrick, George E. Wise and Adrian Kuyper for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow, Deputy Attorney General, Adolph Alexander, Chief Deputy District Attorney, and Herman L. Arterberry, Deputy District Attorney, for Respondent.

MOORE, P. J.—Defendant appeals his conviction on the charges of conspiring with Winifred June Clark (who died prior to the trial of the action) to cheat and defraud by criminal means, to make false promises with the fraudulent intent not to perform them, to commit grand theft, to violate the Corporate Securities Law, Corporations Code, sections 25000 et seq., and to violate section 3020, subdivision (b) of the Corporations Code relating to the falsification of corporate records (Count I); commission of grand theft (Counts II, III, IV, V, VI, X and XI); and fraudulently falsifying corporate records (Counts VII, VIII and IX).

The basic facts underlying the perpetration of the foregoing offenses may best be set forth in the consideration of the evidence supporting the conspiracy count. ▮ Appellant advises us that in considering the record we should not apply

the familiar "substantial evidence test" but rather should satisfy ourselves beyond a reasonable doubt as to the guilt of appellant. The reasoning suggested is as follows: The rule that an appellate court will not upset the judgment of a trial court where substantial evidence supports it is based upon the premise that the trier of fact is deemed to have had the superior advantage in appraising witnesses and in evaluating their credibility (*Maslow* v. *Maslow,* 117 Cal.App.2d 237, 243 [255 P.2d 65]) ; therefore, where the case is submitted to the trial court upon the transcript of the preliminary hearing, as here, the cited rule no longer should prevail. (Civ. Code, § 3510.) However, the accused had his choice as to how the facts were to be presented to the trial court. There might have been a complete hearing with oral testimony or confrontation, or a consideration of a written transcript or, perhaps, testimony taken by deposition His choice of submitting his defense upon the transcript of the preliminary does not entitle him to a virtual new trial in the appellate court. A situation similar to submission upon a preliminary transcript may be found in the civil cases. When an appellate court reviews the findings of a trial court following a trial de novo of a matter adjudicated by an administrative agency, the substantial evidence test prevails regardless of whether the only evidence before the trial court was a transcript of the administrative proceeding. (See *Hutchinson* v. *Contractors' State License Board,* 143 Cal.App.2d 628, 631 [300 P.2d 216].)

## THE CONSPIRACY

Appellant promoted the organization and incorporation of a company known as Finance Control of Long Beach in July 1952. The primary business purpose of the corporation was purportedly to factor automobile accounts receivable paper.

Approximately one year later, appellant promoted the formation of a concern known as Finance Clearing of Beverly Hills to engage in the business of "buying and selling notes, conditional sales contracts, and other negotiable paper and choses in action of all kinds." It is his activities in the management of this corporation which provide the substance of the information filed against him.

In promoting these ventures, appellant refrained from occupying an openly official status in the corporations. They were formed by dummy incorporators. Appellant "appointed" officers of the several concerns without regard to the legal amenities that are customarily observed in the elec-

tion of corporate officers. He was careful to people the responsible offices of his several concerns with persons of no experience in business management and particularly unversed in conducting a factoring enterprise. A veritable parade of secretaries, stenographers and bookkeepers were "installed" by appellant as officers of the corporations at one time or another. For example, appellant designated one Frank Maierhofer as president of Finance Clearing for a period of time during which extensive financial mismanagement occurred. Mr. Maierhofer's previous business experience had been, primarily, employment as a head waiter. Miss Aida Ferrera, then 19 years of age, was appointed secretary-treasurer five weeks after her employment as a secretary through an employment agency. Throughout, appellant maintained sole control over the management of the enterprise under the generic title of "General Manager." The evidence leaves no doubt that Finance Clearing was merely the right arm of appellant Comstock.

Appellant's coconspirator Clark was employed by Finance Clearing sometime in October or December 1953. Thereafter, she became vice president of that company. Whatever might be said for the activities of Miss Clark, she was not wholly devoid of previous experience in financial management.

In order to do any business, it was essential for Finance Clearing to obtain money from lenders, or investors as the case may be, so that accounts receivable could be purchased from various merchants. However, a balance sheet of December 31, 1953, probably prepared by Comstock, showed a deficit of $9,000. At least one potential investor informed appellant that he would not consider risking his funds with an organization whose financial statement showed so poor an earnings record. A response to this invitation to do something about the adverse earnings record was not long delayed.

An accountant, Yawdick, hired by Finance Clearing testified that had a balance sheet been prepared for the months of January and February, a deficit would no doubt have been revealed. However, statements prepared by the accountant for March, April, May and June of 1954 on the basis of information furnished on transmittal sheets prepared in the office of Finance Clearing showed a remarkable enhancement in the affairs of the corporation. Earnings multiplied rapidly and a surplus soon mounted. Subsequent investigation revealed that this surplus was entirely the result of fabrication.

The first instance of outright fiscal skullduggery occurred in

March. In that month Finance Clearing supposedly purchased over $11,000 in accounts receivable held by E. J. Grau and Son, a plumbing concern, for the consideration of one dollar. These accounts were, at the instance of appellant, carried on the books of the corporation as an asset at their face value of $11,000 instead of one dollar, their purchase price, which would have been the proper accounting practice. Moreover, the testimony of Mr. Grau established that no accounts had ever been sold by his concern to Finance Clearing. They were entirely bogus. The false accounts were apparently first written on some blue and green sheets in the handwriting of Miss Clark. She later admitted to various persons that she had copied the names of the purported debtors from the telephone directory. The accounts were subsequently recorded on account cards in the Beverly Hills office and from there transmitted to the accountant in Long Beach who recorded them on the books of the corporation. No direct evidence was presented as to who directed the transmittal of the Grau accounts to the accountant.

In subsequent months, similar false transactions with Businessmen's Association, Maxwell's Department Store, Central Chevrolet and Utter-McKinley Morticians were recorded. By this time, Miss Ferrera had been employed by Finance Clearing. She testified that *both appellant and Miss Clark* directed her to copy the accounts directly from the blue and green sheets onto the account cards and the transmittal sheets prepared for the accountant. Therefore, appellant knew that accounts in large sums purchased for an incredibly small consideration were being carried into the books. Furthermore, Miss Ferrera testified that this procedure was not normal in the case of the purchase of accounts. Ordinarily the account cards and transmittal sheets were prepared directly from the very contracts assigning the accounts rather than from a list prepared upon some scratch paper. Appellant was well aware of this highly irregular circumstance. Appellant insists that this very important testimony of the witness Ferrera must be accorded the usual limitations placed upon the testimony of an "accomplice." However, if it may reasonably be inferred that a witness is not an accomplice, it is for the trier of fact to determine the question of complicity. (*People* v. *Santo,* 43 Cal.2d 319, 326, 327 [273 P.2d 249].) It will be presumed that the witness was found not to be implicated in the crime where such presumption would further tend to effect affirmation of the judgment. (*Ibid.*) Here

Ferrera denied any knowledge of the fictitious nature of the accounts at the time she entered them upon the records maintained by the corporation. In view of her youth, the short time she had been employed and her inexperience in business matters, it is entirely reasonable to infer that she obeyed orders issued by appellant without consideration of whether or not they were financially sound.

Appellant subsequently employed these falsely inflated financial statements to impress investors with the stability of his enterprise. Although he was the individual primarily responsible for inducing prospects to lend or invest money, Miss Clark accompanied him at least once to the home of a prospect for the purpose of inducing the victim to part with his funds.

However, the Corporation Commissioner had ordered appellant in November 1953 to cease and desist from the sale of securities without a permit. As the commissioner began a closer and closer investigation of appellant's activities, the latter apparently became alarmed about the bogus accounts on the books. At any rate, he attempted a very transparent scheme to cleanse them from his records without affecting his statement of earnings. Miss Ferrera testified that appellant instructed her to draw checks upon the Finance Clearing account, to record those checks as payments upon the fictitious accounts whereby to reduce their credit balance, and then to deposit the checks in the very same account upon which they were drawn. In other words, total "wash" transactions whose effect would be to reduce the valuation of the fictitious assets without affording a corresponding increase in cash. When his accountant asked him what he hoped to accomplish by these transactions appellant answered that he wished to credit the accounts with these sums but not to charge them against profit and loss. When the accountant told him that it could not be done, appellant told him to "forget it." The "wash" transactions were treated as void and were not entered on the books.

Finally, appellant decided that the accounts must be removed from the books. He instructed Miss Ferrera to prepare a transmittal sheet which would show these accounts, totaling more than $123,000, entirely charged off as bad debts. The charge-off was made as of July 31, 1954. The resultant balance sheet as of that date showed an $89,000 deficit. Although no statements were prepared during intervening months, a subsequent balance prepared as of December 31,

1954, showed that the ill-fated Finance Clearing had slumped still further into a $114,000 deficit balance. Even that final balance sheet was described as excessively optimistic by the accountant who aided in its preparation. However, appellant took care that no financial statement should reach his investors following the charge-off. He made various misrepresentations explaining his failure to continue sending the sheets. He told one investor that over $100,000 in asset accounts had been written off so as to effectuate a "tax saving."

Further to demonstrate appellant's intimate connections with his coconspirator Clark, upon at least one occasion he showed considerable largesse in siphoning funds of the corporation into her hands. Upon learning that Miss Clark desired to own a certain collection agency in Palm Springs, appellant without further ado instructed her to write two checks totaling $5,000 against the account of Finance Clearing. The checks were signed by appellant and Clark, payable to appellant, endorsed by him and used by Clark to purchase the agency. Appellant told Miss Ferrera that he was giving Clark the sums so that she could "have something in her hip pocket." Although he took her promissory note for the sums, he did not expect Miss Clark to repay it and never demanded that she do so.

■ In order to establish a conspiracy, there must be proof of a corrupt agreement between at least two persons (*People v. Gem Hang*, 131 Cal.App.2d 69, 71-72 [280 P.2d 28] ; *People v. Frankfort*, 114 Cal.App.2d 680, 688 [251 P.2d 401]) since the gist of conspiracy is the enhanced danger to society from wrongful combination of purpose. (Comment, 26 So.Cal.L. Rev. 64, 68.) Appellant argues that there is no evidence that he and Miss Clark ever combined forces to defraud investors or falsify corporate records; that each operated in a vacuum without common agreement or purpose. ■ But direct evidence of a formal understanding between confederates is not essential to the proof of a conspiracy. It is not necessary to prove that the parties actually met, discussed their mutual design and understanding, and reached a formal agreement. The extent to which the minds of conspirators are in accord with respect to their conspiracy must usually, from the secrecy of the crime, be deduced from the circumstances which, when taken together, indicate that they are parts of the same complete whole. (*People v. Rissman*, 143 Cal.App. 2d 488, 494 [299 P.2d 944] ; *Lorenson v. Superior Court*, 35 Cal.2d 49, 57-58 [216 P.2d 859].) ■ The actions of the

alleged conspirators when considered in conjunction with what must have been within their knowledge may irresistibly tend to establish the existence of an agreement, tacit, perhaps, in character but nevertheless corrupt. (See *People* v. *Fratianno*, 132 Cal.App.2d 610 [282 P.2d 1002]; *People* v. *Bennett*, 132 Cal.App.2d 569 [282 P.2d 590]; *People* v. *Daener*, 96 Cal.App.2d 827 [216 P.2d 511].)

██ Appellant was in sole command of Finance Clearing operations, surrounded only by those subservient to him. He knew that $123,000 worth of assets were added by Miss Clark to the corporate books upon the payment of a ridiculously petty consideration. He knew that they were incorporated into the records in a highly irregular fashion from a list prepared by Miss Clark on scratch paper. He supervised the inclusion of some of those accounts on the corporation records. He subsequently attempted to "wash" them out gradually by improperly juggling the accounts. He finally charged them off altogether while withholding the resultant deficit statements from his investors. He used the bloated balance sheets to encourage new investment. "So interrelated and harmonious were the operations of defendants as disclosed by the documents and the testimony . . . that . . . honest deduction could not but reasonably have inferred their conscious collaboration with a definite purpose." (*People* v. *Gordon*, 71 Cal.App.2d 606, 627 [163 P.2d 110].)

It must be conceded that the above factual statement reveals a "prima facie" showing of a conspiracy between appellant and Clark and therefore justifies admission into evidence of an extrajudicial utterance of one conspirator to the prejudice of the other. (*People* v. *Steccone*, 36 Cal. 2d 234, 238 [223 P.2d 17]; *People* v. *Brown*, 131 Cal.App. 2d 643, 655 [281 P.2d 319]; *People* v. *Sica*, 112 Cal.App.2d 574, 583 [247 P.2d 72].) Two witnesses, Swinford and Ferrera, stated that Miss Clark admitted to them her preparation of the bogus accounts, and further that her activities had taken place under the knowing direction of appellant.

GRAND THEFT

Appellant was convicted also of cozening several investors out of substantial sums of money by means of false pretenses. Their investments were not returned.

Louis Q. Sims invested $9,000 in Finance Clearing after having been shown by appellant the fraudulently bloated April balance sheet. Appellant had not informed him that

the Corporation Commissioner had issued a cease and desist order against the corporation. William Gloege parted with his money in reliance upon appellant's false assertions that the sums would be held in trust by a certified public accountant bonded for $100,000 and upon one or two of the false balance sheets shown to him. Also, he was not apprised of the action of the Commissioner. Otis Swinford was similarly defrauded. When he communicated with the accountant to discover why he did not receive the July statement, appellant wrote him a letter falsely stating that appellant and the accountant had agreed upon a "continuous work sheet" method of keeping books and had not made a July statement and would not make periodic balances in the future.

E. L. Landgarten responded to a newspaper advertisement inserted by appellant on behalf of Finance Clearing. He was promised by appellant that his funds would be safe and that at all times they would be secured by 50 per cent in cash and 75 per cent in automobile paper. The true balance sheets, minus the fictitious accounts, indicate that this promise was never kept. Appellant's dealings throughout the existence of Finance Clearing justify an inference that he never intended to live up to his promise.

Norman Jensen relied upon appellant's false representations that an investment in Finance Clearing was safer' than in building and loan because the investment would be secured to 125 per cent of the money invested; that it would be backed by 50 per cent cash and 75 per cent paper; and that Mr. Jensen could get his money back upon demand. At no time was the victim informed of the cease and desist order.

Appellant was also convicted of the theft of $1,500 from Finance Clearing (Count VI). Miss Ferrera testified to the following events: By the time this transaction occurred she had discovered appellant's prior falsification of corporate records; she came to be in urgent need of $1,500; she was aware that appellant knew that she had discovered his misdeeds; she asked appellant while driving with him to the airport whether she might have a loan or an advance of the sum she needed; he told her to take a check from a pad of checks which he had presigned, make it out for $1,500 in favor of a fictitious payee, countersign it in her own name, indorse and cash it and enter the credit in the petty cash and miscellaneous account; she followed these instructions. The check was introduced into evidence.

It is clear from the above account that Miss Ferrera

was at least an accomplice to this misdeed. Her testimony was essential to the conviction of appellant on this charge. Therefore, corroboration must be found for her recital of such events. (Pen. Code, § 1111.) ▊ "The statutory requirement of corroboration is based primarily upon the fact that experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity." (*People* v. *Wallin,* 32 Cal.2d 803, 808 [197 P.2d 734]; *People* v. *Robinson,* 43 Cal.2d 132, 141 [271 P.2d 865]; and see generally re the distrust to be afforded the testimony of an accomplice, *People* v. *Dail,* 22 Cal.2d 642, 653 et seq. [140 P.2d 828].) The instant situation is perfect for the application of this salutary policy. Although every physical act necessary to this crime was admittedly accomplished by Miss Ferrera, she was not prosecuted.

The quantum of evidence required to corroborate the testimony of an accomplice has been detailed repeatedly by the courts (e.g. *People* v. *Morris,* 115 Cal.App.2d 312, 316 [252 P.2d 36]) usually for the purpose of pointing out how minimal it may be and yet suffice. ▊ However, as recently and workably stated, the corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. (*People* v. *MacEwing,* 45 Cal.2d 218, 224 [288 P.2d 257].) The attorney general offered the following independent items of evidence to connect appellant with the theft:

(1) Appellant's signature on the check as a drawer along with Ferrera is a signature upon an incriminating document, a fact which has been held sufficient corroboration. (*People* v. *Morris, supra.*) However, the witness' own testimony established that appellant was not even present when the check was prepared and that Ferrera used a check from a pad of checks presigned by him. In this light, how can it be said that his signature in any way "connected defendant with the commission of the crime" as required by the *MacEwing* case? We must rely wholly upon Miss Ferrera's unsupported word that appellant *told* her to use that presigned check.

(2) Evidence was introduced to prove that appellant had diverted corporate funds to other than corporate uses upon other occasions. For example, appellant "loaned" funds belonging to the corporation to Miss Clark for -her use

in acquiring a collection agency, evidently never intending to seek repayment. Also, he used Finance Clearing funds to purchase an expensive yacht after chartering it for a private junket to Mexico. The yacht was subsequently transferred without payment of consideration to a Nevada corporation acquired during the mushrooming expansion of the activities of Finance Clearing. The reason given for the transfer was to avoid (a) attachments of the corporation's properties and (b) the effect of the cease and desist order which had been levied against Finance Clearing.

 Proof that a defendant committed other recent and similar offenses tending to show a consistent plan or method of misconduct is admissible to prove the particular crime charged. (*People* v. *Thorne,* 10 Cal.2d 705, 708 [76 P.2d 491].) Such evidence may corroborate the testimony of an accomplice. (*People* v. *Gallardo,* 41 Cal.2d 57, 64 [257 P.2d 29]; *People* v. *Solano,* 48 Cal.App.2d 126, 130 [119 P.2d 381].) However, it might well be said that when a situation exists as in this case where one out of several guilty parties is caught in one or two transgressions, caution should be exercised in allowing those transgressions to justify the unloading by his confederates of their wrongdoing upon his head in exchange for leniency. Certainly the past misdeeds must unfold some characteristic technique or *modus operandi* before they "connect defendant with the commission of the crime." (See *People* v. *Gallardo, supra.*) The other acts proved here establish merely that appellant was loose with corporate funds; none of the other transactions show any marked similarity to one another or to the Ferrera transaction. The transfer of the funds to Miss Clark was recorded as a loan. The yacht was purchased without any deception in books of Finance Clearing. Other than the fact that these instances disclose appellant's general misconduct, nothing connects appellant with this crime save the testimony of Miss Ferrera that he directed her actions. Thus, the judgment of conviction under Count VI must be reversed.

### FALSIFICATION OF CORPORATE RECORDS

 "Every . . . agent . . . of any corporation . . . who, with intent to defraud . . . falsifies any of the books, papers, writings, or securities belonging to the corporation, or makes or concurs in making any false entries, or omits or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense." (Corp. Code Ann., § 3020, subd. (b).)

Counts VIII and IX of the information deal with the falsification of corporate records by transmittal to the accountant of the purchase of the fictitious E. J. Grau and Son and Utter-McKinley accounts, respectively. The evidence recited under the conspiracy count, *supra*, suffices to render appellant an accomplice of Miss Clark in the falsification of the accounts receivable with intent to inflate the financial statements of the corporation and thereby defraud future investors.

Count VII involves the entry by Ferrera of the $1,500 check prepared as a gift or ''bonus'' to her in the ''petty cash, furniture, fixtures, and miscellaneous'' account at the direction of appellant. This matter has likewise been discussed above under the heading ''GRAND THEFT'' (Count VI). For the same reasons there presented, this count must be reversed.

### DENIAL OF THE RIGHT TO COUNSEL?

Appellant's former counsel chose, with the consent of his client, to submit the case on the preliminary transcript with very little additional evidence presented by the defense to the trial court. Appellant now claims that the submission of a case as complex as this upon the preliminary transcript constituted such gross neglect on the part of his attorney as effectively to deprive him of the right to counsel. Three answers to this contention are: (1) An abundance of case law holds that, under ordinary circumstances, an accused may not complain for the first time on appeal of the inept conduct of trial counsel of his own choosing. (*People* v. *Daniels,* 145 Cal.App.2d 615, 619 [302 P.2d 831]; *People* v. *Hood,* 141 Cal.App.2d 585, 587-590 [297 P.2d 52].) (2) Submission on the preliminary transcript may have been the wisest course under the circumstances. If appellant had no true defense to present, he was entitled to avail himself of his right to have the People prove him guilty beyond a reasonable doubt. The prosecution's case may appear much less convincing in a ''cold'' transcript than when unfolded before a trial judge. (3) The nature of appellant's crimes indicates that he is not an ''ignorant'' defendant likely to remain still while his counsel fails to present a bona fide defense.

Although the wisdom of submitting cases on preliminary transcripts has been seriously questioned (e.g. *People* v. *Stinchcomb,* 92 Cal.App.2d 741, 743-744 [208 P.2d 396]), it cannot be said that such practice denies the right of the

accused to counsel where with full knowledge of the consequences he allows his trial so to be conducted.

The judgment of conviction on Counts VI and VII of the information is reversed.

In all other respects, the judgment is affirmed.

Fox, J., and Ashburn, J., concurred.