1023[No. B094768. Second Dist., Div. Seven. Sept. 27, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
OMAR WALDO BARILLAS, Defendant and Appellant.

1014

[black redaction bars]

## Counsel

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

LILLIE, P. J.—A jury convicted appellant of first degree murder (Pen. Code, § 189; count I; statutory references, unless otherwise noted, are to the Penal Code), attempted robbery (§§ 664/211; count II), residential burglary (§ 459; count IV), and two counts of robbery (§ 211; counts III and V). Personal gun use allegations—as to all counts except burglary—were found true (§ 12022.5) as was an attempted robbery special circumstance allegation (§ 190.2, subd. (a)(17)). No verdict was reached regarding an additional attempted robbery charge (§§ 664/211; count VI) and it was dismissed. Appellant was sentenced to state prison for life plus five years, without the possibility of parole.

We hold sufficient evidence corroborated the testimony of accomplice Michael Martinez, we find no instructional error, and we affirm the judgment.

### Factual Background

Unlike the usual case, the trial evidence was almost without contradiction. Fifteen witnesses (one by stipulation) testified for the prosecution, none for the defense. The principal events occurred on two days, Thursday December 9, 1993, and Sunday December 12, 1993, all within a small area of Canoga Park near Roscoe and Topanga Canyon Boulevards. We summarize the

evidence but, because of appellant's insufficient corroboration contention, in more than usual detail.

In late November 1993, Michael Martinez (Martinez) met Timothy Petersen (Petersen) at the Austin-Healey restoration shop in Canoga Park where Petersen was head mechanic. Martinez, 23 years old and unemployed, was looking for a job. Petersen obtained a job for Martinez at a nearby shop and let Martinez share his apartment at 7810 Topanga Canyon Boulevard, apartment 120.

Almost immediately, two recent acquaintances of Martinez's, appellant and appellant's girlfriend Genessa Geddry (Genessa), began staying at the Petersen apartment. Genessa, 14 years old, tall with long brown hair, had recently been "kicked" out of her divorced father's house. Appellant was eighteen, five feet five inches, slender, with short almost "shaved" hair, and had no permanent residence.

Sometime before December 9, Petersen noticed that appellant and Genessa were sleeping overnight in his apartment and he told them—or told Martinez—they could not do so.

On December 9, after Petersen had departed for work, appellant and Genessa visited Martinez at the Petersen apartment.[1] Genessa soon left to "scope out" apartment 233. She went up a short flight of stairs leading to apartment 233, broke a window, entered, and opened the front door for appellant. As the assistant manager (Rosella Higgins) watched from her office window, Genessa and appellant ransacked the apartment, and repeatedly carried loot to the Petersen apartment. Among the property they brought there was a shotgun, which Martinez hid under Petersen's couch, and a .38-caliber dark-colored Smith and Wesson revolver with a box of .38-caliber Remington ammunition. Appellant was "ecstatic" over the revolver, loading and unloading it.

When Martinez exited the Petersen apartment to help appellant and Genessa with the burglary he saw the assistant manager on the phone, talking as she watched them. Martinez went downstairs and caught a bundle of loot appellant tossed him. The three of them quickly and separately left, before the police arrived.

Later that evening, the three of them got together at Topanga Canyon and Roscoe, a short distance from David Murth's apartment. David Murth (Murth) was a 31-year-old electrician with a $500-a-week rock cocaine

---

[1] Although Petersen testified he had earlier evicted Martinez, Martinez disagreed.

habit. Appellant was his street dealer. Genessa and Martinez often would buy rock cocaine for Murth from appellant. All of them smoked rock cocaine.

One of the places where appellant, Genessa and Martinez sometimes stayed was the Cafe Romantique, an abandoned restaurant near Roscoe and Topanga Canyon. Appellant, to test his newly acquired .38-Caliber revolver, fired a round at the restaurant ceiling.

On Sunday, December 12, 1993, appellant and Martinez were drinking with Murth in his apartment when appellant suggested they commit some robberies to get money for rock cocaine. Martinez and Murth agreed and the three of them left in Murth's white pickup truck with Murth driving, Martinez in the middle, and appellant, wearing a black coat with a hood and with his loaded .38-caliber revolver, by the passenger door.

About a mile away, at a little mall where she had her Satin Nails shop, Erlinda Gibbons (Gibbons) was with her 65-year-old mother. It was about 7:30 p.m. and Gibbons slowly walked with her mother to her car. She opened the passenger door, let her mother enter, walked to the driver's door and was about to enter when she saw a man in a long black coat with a hood run toward her. He said "Give me your money." Gibbons quickly entered her car and locked the door. The man pointed a dark gun at her and Gibbons was so scared she dropped her car keys. As the man continued to point the gun at her she kept blowing her car horn.

Martinez, who was urinating at a nearby corner, heard the honking and saw appellant run toward him as restaurant customers, hearing the commotion, exited the restaurant. Appellant and Martinez ran to the nearby pickup truck, jumped in, and Murth drove off.

Gibbons described the would-be-robber to the police: Hispanic, five feet four inches, thin build, about twenty years old.[2]

An hour and a half later, about 9 p.m., Murth parked his white pickup in front of a liquor store next to an Alpha Beta market, about a mile from Roscoe and Topanga Canyon Boulevards. Appellant got out.

Soon, Joel Bromley (Bromley) parked his truck next to the white pickup, got out, and started toward the liquor store when someone approached and asked for money. Thinking the person was a panhandler, Bromley said

---

[2]Gibbons was unable to identify appellant as the attempted robber. The jury hung on this count (count VI).

"what?" The person pulled back his shirt and displayed what looked like a .38-caliber revolver tucked into his pants. Bromley attempted to hand a $20 bill to the person but he told Bromley to get between the two trucks. Bromley did and saw there were two people in the white pickup. Bromley then dropped the $20 bill, the person asked "Where is the money?" Bromley pointed to the ground, and heard the white pickup passenger say "shoot him, shoot him."[3] When the robber momentarily turned toward the white pickup, Bromley fled.

A month later Bromley identified appellant's photograph and at trial, positively identified him despite appellant having gained weight and having let his hair grow out.

With the $20 appellant, Martinez, and Murth bought rock cocaine. But— with the three of them—it was soon gone.

About an hour later, Murth parked behind a 7-Eleven at Saticoy and Fallbrook. Appellant and Martinez exited.

Chief Petty Officer James Kluber (Kluber) parked under a light in front of the Saticoy-Fallbrook 7-Eleven, entered, bought cigarettes, and was returning to his car when he saw two young men walk toward him. One of them veered off and the other asked Kluber what time it was. Kluber ignored him, opened his car door, and was half inside when the man repeated the question. Kluber told him the time—it was about 10:30 p.m.—and the man demanded his money. Kluber looked up, saw a dark .38-caliber revolver tucked into the man's pants, and froze. Then he got out, removed his wallet, and put five $1 bills on his car hood. The robber grabbed them and he and his companion ran off, disappearing into an alley.

Kluber called 9-1-1 from the 7-Eleven and described the robber as a five-foot, six-inch Latino with a shaved head wearing baggy clothes who looked sixteen years old. Kluber identified appellant from his photograph, at a live lineup, and at trial.

After robbing Kluber, appellant and Martinez ran through the alley, jumped into the pickup, and Murth "floored it"—leaving the scene. When Murth learned appellant had gotten only $4 or $5 he said "this is crazy" and drove back to his apartment. The alcohol had mostly worn off and Murth told appellant and Martinez that he was done for the evening. They said they wanted to continue so Murth gave them his truck keys and the two of them left.

---

[3] Martinez denied making the statement and was unsure whether or not Murth may have made the statement.

Martinez drove east on Roscoe toward DeSoto.

Gerald McNally (McNally),[4] a long-haired, 32-year-old film producer, had just arrived in the Canoga Park area and had not unpacked his suitcases. He left them in his apartment near Roscoe and DeSoto and walked to an automated teller machine (ATM). At 11:02 and 11:03 p.m. he made two withdrawals, $200 and $300. He put $100 in his coat pocket, walked to an apartment building at 20951 Roscoe, and approached Gerardo Acosta (Acosta) who was standing outside. He asked Acosta about buying cocaine and Acosta began walking with McNally west toward Variel where Acosta's seller lived.

Appellant and Martinez saw the tall Caucasian man (McNally) approach Acosta and saw them walk off together. Appellant, who knew Acosta, told Martinez to let him out. Appellant joined Acosta and McNally as Martinez drove past them, turned on Variel and parked.

When Martinez saw the three men reach Variel he got out and asked appellant, "What's going on?" Appellant replied, "Hold on . . . it will only be a minute."

Acosta told McNally to wait at the corner. Acosta and appellant then crossed the street and went to an apartment building. Appellant remained outside while Acosta entered and started up the stairs.

Martinez saw appellant join McNally, talk to him briefly, and then jump back. When McNally tried to grab appellant, he jumped back again. Appellant then extended his arm toward McNally and Martinez heard one gunshot. No one else was near them. McNally started to run and then fell.

Acosta continued up the stairs and knocked on his seller's door but was told to leave because someone had been shot. Acosta left the building, saw McNally's body, remembered that McNally had money, found a $100 bill in McNally's pocket, and walked away with it.

After appellant shot McNally he ran to the white pickup, jumped in, and explained—when Martinez asked him what had happened—that he was going to "jack" the dude.

As Martinez maneuvered the white pickup away from the curb he left the lights off. Ahead he saw a reddish Camaro. When it turned, Martinez turned his lights on.

---

[4]The amended information spells the victim's name both McNally and McNalley. The reporter's transcript spells it McNally. We adopt that spelling.

Hovik Adamiyekteh (Adamiyekteh), driving his brownish red Camaro, had just dropped off a friend near Roscoe and Variel when he heard a gunshot, saw a Caucasian guy with long hair take a couple of steps and fall down. He then noticed a white pickup without lights. When Adamiyekteh turned a corner, the pickup's lights went on.

Martinez drove to Murth's apartment. Appellant handed him a bullet casing and told him to get rid of it. Martinez wiped it off and threw it into Murth's dumpster.

When Martinez and appellant entered Murth's apartment they seemed "frantic." Appellant told Murth "he might have shot and killed somebody" and showed Murth that two bullets were missing from his revolver. After about 10 minutes appellant and Martinez left. Murth saw appellant discard the revolver in a garbage can by the apartment's laundry room. Later, when Murth looked for the gun, it was gone.

When appellant and Martinez left Murth's apartment they walked to the abandoned Cafe Romantique. Genessa was there, asleep. Appellant woke her and told her what had happened. He said, "Baby, I made a mistake." He also told her he had shot "this white fool" at Variel and Roscoe after he had put up a fight.[5]

About a week later Acosta saw appellant and asked him what had happened "that night." Appellant laughed.

Robbery-homicide Detective Pietrantoni and his partner, Detective Henry, investigated the murder of McNally. They arrived at the scene about 3 a.m., saw the deceased near a tree by the corner of Roscoe and Variel, recovered ATM receipts and $400 from his person, and went to his apartment. Although they interviewed scores of people, none admitted seeing the shooting. The detectives had no suspects.

Later in December 1993, some days after the murder, Martinez called Narcotics Detective Buscarino. Martinez had worked for Detective Buscarino as a narcotics informant and Martinez trusted him. In January 1994, when he returned from vacation, Detective Buscarino met with Martinez. Martinez told him he had "witnessed" a murder in December at Roscoe and Variel. Detective Buscarino did not attempt to elicit details from Martinez.

---

[5]Genessa claimed she did not remember appellant making these statements or that she had told the police appellant *had* made them. A tape recording of her statements to the police was played to the jury.

Genessa admitted she loved appellant, had been pregrant by him, and would marry him if she could.

Instead, he confirmed there had been such a murder, contacted the investigating officers, and told them of Martinez.

Detectives Pietrantoni and Henry interviewed Martinez. He told them the details of the December 9 burglary and the December 12 robberies, attempted robberies, and murder. He identified appellant, Murth, Genessa, and Petersen.

The detectives went to the abandoned restaurant and recovered a spent .38-caliber bullet.

A ballistics expert (George Stanley) determined that both the bullet that killed McNally and the bullet recovered from the abandoned restaurant could have been fired from a .38-caliber Smith and Wesson revolver. Although he could not state the bullets were fired from the same gun, the expert testified they had the same number of lands and grooves.

In early January 1994, appellant, Genessa, Murth, and Martinez were arrested.

Murth was charged with and pleaded guilty to the December 12 robberies. The district attorney made no deals with him.

A burglary petition was filed against Genessa and sustained.

Martinez was initially a codefendant of appellant's. They were held to answer on the same charges and arraigned on the same charges in superior court. Prior to trial, Martinez, as part of a plea bargain, pleaded guilty to all charges (including the attempted robbery of Gibbons) *except* the murder of McNally, in exchange for a 10-year, 8-month maximum sentence. He was required, as part of the bargain, to testify truthfully at appellant's trial and would be sentenced *after* that trial.

## DISCUSSION

### I

*Appellant Contends There Is Insufficient Evidence to Corroborate*
*Accomplice Martinez's Testimony Concerning the Murder and Attempted*
*Robbery of Victim McNally*

 Although Martinez was an accomplice to all the charged offenses, appellant's contention is limited to those involving the murder and attempted robbery of McNally. As to those charges only appellant argues the corroboration of Martinez's testimony was insufficient.

The accomplice corroboration requirement is statutory. Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

■ Corroborating evidence may be entirely circumstantial (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704]). " ' "Such evidence 'may be slight and entitled to little consideration when standing alone.' " ' " (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1128; *People v. Fauber* (1992) 2 Cal.4th 792, 835 [9 Cal.Rptr.2d 24, 831 P.2d 249].) "It need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*Id.* at p. 834; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1206 [249 Cal.Rptr. 71, 756 P.2d 795].)

■ We find the following evidence more than sufficient to corroborate accomplice Martinez's testimony that appellant murdered and attempted to rob McNally: (1) Acosta's testimony that when he entered the apartment building moments before the victim was shot, appellant was only a short distance from the victim; (2) Acosta's testimony that after the shooting appellant apparently fled (§ 1127c; CALJIC No. 2.52); Acosta's testimony that, a week after the murder, when he asked appellant what happened that night, appellant "laughed"; (3) testimony the victim was killed by a .38-caliber bullet and appellant possessed a stolen .38-caliber weapon; (4) evidence the fatal bullet had the same markings as the bullet recovered from the abandoned restaurant; (5) Murth's testimony[6] appellant said "he might have shot and killed somebody"; (6) Murth's testimony that appellant discarded the .38-caliber revolver in the trash can—and then it was missing; (7) Genessa's testimony[7]—and extrajudicial statements admitted for their truth——that appellant said he had shot "this white fool"; (8) Adamiyekteh's testimony he saw a white pickup flee the murder scene; and (9) proof appellant committed three robberies or attempted robberies earlier that same evening using the same white pickup and having the same coperpetrator, Martinez. (*People v. Haston* (1968) 69 Cal.2d 233, 246 [70 Cal.Rptr. 419,

[6]There is no claim that Murth was an accomplice to the murder and attempted robbery of McNally.

[7]Genessa was an accomplice only to the December 9 burglary.

444 P.2d 91]; *People* v. *Comstock* (1956) 147 Cal.App.2d 287, 298 [305 P.2d 228] ["Proof that a defendant committed other recent and similar offenses tending to show a consistent plan or method of misconduct is admissible to prove the particular crime charged. [Citation.] Such evidence may corroborate the testimony of an accomplice."].)

II

INSTRUCTIONAL ERROR CLAIMS

A. *Reasonable Doubt*

Appellant makes the familiar claim that omission of "moral certainty" from the reasonable doubt instruction (CALJIC No. 2.90) was prejudicial error. We disagree.

Even *un*modified, with the antiquated and confusing phrase "moral certainty" retained, the United States Supreme Court held our standard reasonable doubt instruction constitutional. (*Victor* v. *Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239].)

Mindful of the high court's criticism of the phrase "moral certainty," our State Supreme Court made this pointed suggestion to trial courts: "It thus seems that trial courts might, in the future, safely delete the following phrases in the standard instruction: 'and depending on moral evidence,' and 'to a moral certainty.'" (*People* v. *Freeman* (1994) 8 Cal.4th 450, 504 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.4th 888].)

We cannot say that by faithfully following the explicit direction of our Supreme Court, the trial court erred.

B. *Omission of CALJIC No. 5.16 (Forcible and Atrocious Crime—Defined)*

Almost entirely relying upon Martinez's testimony that appellant had "jumped back" and then when McNally tried to grab him, appellant jumped back again—appellant claimed the shooting of McNally was in self-defense or in "unreasonable" self-defense.

The trial court instructed on both (CALJIC Nos. 5.10 [Resisting Attempt To Commit Felony], 5.12 (1989 rev.) [Justifiable Homicide In Self-Defense], 5.17 (1994 rev.) [Actual But Unreasonable Belief In Necessity To Defend—Manslaughter], 5.54 [Plea Of Self-Defense May Not Be Contrived]).

■ Appellant's only contention concerning these instructions is one of them (CALJIC No. 5.10)[8] used the terms *"forcible* and *atrocious* crime" and it was prejudicial error to omit the instruction (CALJIC No. 5.16)[9] which defined these terms. The contention is meritless.

Instructions are judged in their entirety, not in isolation. (*People* v. *Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) The multiple self-defense instructions fully and correctly informed the jury about both self-defense and "unreasonable" self-defense. CALJIC No. 5.10 was surplusage, added nothing to the other instructions, and should not have been given. *If* appellant wanted its terms "forcible" and (the antiquated) "atrocious" clarified, he had a duty to request such clarification. (*People* v. *Smith* (1992) 7 Cal.App.4th 1184, 1188 [9 Cal.Rptr.2d 491].) He did not.

### DISPOSITION

The judgment is affirmed.

Johnson, J., and Woods, J., concurred.

**WOODS, J.,** Concurring.—Although I have joined the excellent opinion of the court I write separately to address a matter intimately involved in the instant case and rarely analyzed by appellate courts: the law of accomplices.

The Legislature should repeal Penal Code section 1111 because it is unnecessary, causes trial confusion, requires appellate review, and unjustly results in the exoneration of perpetrators who would be found guilty or have been found guilty beyond a reasonable doubt. I explain.

"The rules of law and principles of evidence controlling the testimony of accomplices are drawn from the common law." (*People* v. *Coffey* (1911) 161 Cal. 433, 437 [119 P. 901].)

The common law, however, was concerned *not* with whether an accomplice's testimony must be corroborated but whether it should be *admitted*. (161 Cal. at p. 438; 7 Wigmore, Evidence (Chadbourn ed. 1978) § 2056, pp. 404-405.)

---

[8]The instruction reads: "Homicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime." (CALJIC No. 5.10.)

[9]The instruction reads: "[A forcible and atrocious crime, as the term is used in these instructions, is any felony, the character and manner of the commission of which threatens, or is reasonably believed by the defendant to threaten, life or great bodily injury so as to instill in [him] [her] a reasonable fear of death or great bodily injury.] [¶] [[Murder] [Mayhem] [Rape] [Robbery] is a forcible and atrocious crime.]" (CALJIC No. 5.16)

That concern is diminished in our age when the oaths of trial witnesses are freely used but frequently little valued. The opposite was true at common law. Then an oath had great significance. As Dean Wigmore observed: "An oath, in the notions of the time, had a certain dead weight of its own; one oath was as good as another oath. Should a witness once get in, the harm (they thought) was done; for there would be little weighing of the comparative quality of different persons' oaths. The struggle therefore was made at the threshold." (7 Wigmore, Evidence, *supra*, § 2056, p. 405.)

Because of this "certain dead weight" not everyone could take a witness's oath. A convicted felon could not. (*People* v. *Coffey*, *supra*, 161 Cal. 433, 438.) The criminally accused could not. (2 Wigmore, Evidence (Chadbourn ed. 1979) § 575, pp. 808-809.)

Understandably, common law judges were troubled by the prospect of a *self-confessed* felon avoiding his own conviction by accusing another who could not take an oath to deny the accusation. (See Comment, *Accomplice Corroboration—Its Status in California* (1962) 9 UCLA L.Rev. 190.)

By the end of the 1700's a common law solution to this troublesome prospect had been found. The trial judge, in his instructions and comments to the jury, "discourage[d] a conviction founded solely upon the testimony of an accomplice uncorroborated." (7 Wigmore, Evidence, *supra*, § 2056, p. 405.) But such an instruction or comment was mere advice, "not a statement of a rule of law binding upon the jury." (*Ibid.*)

Thus, at common law an accomplice could take an oath and give testimony. And that testimony—uncorroborated—could convict. As Dean Wigmore has observed: "As a matter of common law, then, the [accomplice] doctrine was widely understood . . . as amounting to no rule of evidence, but merely to a *counsel of caution* given by the judge to the jury. It followed that the jury might or might not regard the caution; that they alone were to determine whether corroboration existed and was sufficient; . . ." (7 Wigmore, Evidence, *supra*, § 2056, pp. 408-413, italics in original, fns. omitted.)

Initially, the United States followed the common law practice regarding accomplice testimony. (7 Wigmore, Evidence, *supra*, § 2056, p. 407.) But soon "in nearly half of the jurisdictions of the United States a statute . . . turned this cautionary practice into a rule of law." (*Id.* at p. 414.) Some statutes merely required the giving of a cautionary instruction, others required corroboration for there to be conviction, still others required both. (*Ibid.*)

Dean Wigmore explains this shift from common law practice to statutory mandate: "At common law the judge was entitled and bound to assist the

jury, before their retirement, with an expression of his opinion (in no way binding them to follow it) upon the weight of the evidence. This utterance was made the medium of many useful general suggestions based on experience. The benefit of this experience was thus obtained for them, without any attempt to fetter their judgment by inflexible dogmas unfitted for invariable application as rules of law. One of these general hints was that about accomplices' testimony. But in the United States in a misguided moment the orthodox function of the judge to assist the jury on matters of fact was (except in a few jurisdictions) eradicated from our system. . . . The judge was forbidden to contribute to the jury's aid any expression of opinion upon the weight of evidence in a given case.[1] Unless there was a rule of the law of evidence upon the subject of an accomplice's testimony, he could not in a given case advise them to refuse to convict upon the uncorroborated testimony of an accomplice. The makers of this innovation upon established trial methods were thus obliged to turn into a rule of law the old practice as to accomplices, if they wished to retain its benefit at all. This they therefore did." (7 Wigmore, Evidence, *supra*, § 2056, pp. 416-417.)

Dean Wigmore also explains why it is neither wise nor feasible "to construct a fixed rule of law for all cases . . . ." (7 Wigmore, Evidence, *supra*, § 2056, p. 417.)

"The reasons which have led to this distrust of an accomplice's testimony are not far to seek. He may expect to save himself from punishment by procuring the conviction of others. It is true that he is also charging himself, and in that respect he has burned his ships. But he can escape the consequences of this acknowledgment, if the prosecuting authorities choose to release him, provided he helps them to secure the conviction of his partner in crime:

"Lord Abinger, C.B., in *R.* v. *Farler,* 8 *Car. & P.* 106, 107-108 (1837): 'It is a practice which deserves all the reverence of law, that judges have uniformly told juries that they ought not to pay any respect to the testimony of an accomplice unless the accomplice is corroborated in some material particular. . . . The danger is that when a man is fixed, and knows that his own guilt is detected, he purchases immunity by falsely accusing others.'

"It is true that this promise of immunity or leniency is usually denied, and may not exist; but its existence is always suspected. The essential element,

---

[1]The California Constitution, article VI, section 19 provided that judges shall not charge juries with respect to matters of fact. (See Comment, *Comment on Recent Cases* (1919) 7 Cal. L.Rev. 272, 273.) That provision was repealed and in 1966 replaced by article VI, section 10 which provides: "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause."

however, it must be remembered, is this supposed promise or expectation of conditional clemency. If that is lacking, the whole basis of distrust fails. We have passed beyond the stage of thought in which his commission of crime, self-confessed, is deemed to render him radically a liar. . . . The extreme case of the wretch who fabricates merely for the malicious desire to drag others down in his own ruin can be no foundation for a general rule.

"The promise of immunity, then, being the essential element of distrust, but not being invariably made, no invariable rule should be fixed as though it had been made. Moreover, if made, its influence must vary infinitely with the nature of the charge and the personality of the accomplice. Finally, credibility is a matter of elusive variety, and it is impossible and anachronistic to determine in advance that, with or without promise, a given man's story must be distrusted." (7 Wigmore, Evidence, *supra*, § 2057, p. 417.)

Awareness that this "fixed rule of law" is not reasonable came long ago. A century and a half ago, in prose that can hardly be improved upon, Chief Baron Joy wrote: " 'How the practice which at present prevails could ever have grown into a general regulation must be matter of surprise to every person who considers its nature, or inquires into the foundation on which it rests. Why the case of an accomplice should require a particular rule for itself; why it should not, like that of every other witness of whose credit there is an impeachment, be left to the unfettered discretion of the judge, to deal with it as the circumstances of each particular case may require, it seems difficult to explain. Why a fixed, unvarying rule should be applied to a subject which admits of such endless variety as the credit of witnesses, seems hardly reconcilable to the principles of reason. But, that a judge should come prepared to reject altogether the testimony of a competent witness as unworthy of credit, before he had ever seen that witness; before he had observed his look, his manner, his demeanour; before he had had an opportunity of considering the consistency and probability of his story; before he had known the nature of the crime of which he was to accuse himself, or the temptation which led to it, or the contrition with which it was followed;—that a judge, I say, should come prepared beforehand, to advise the jury to reject without consideration such evidence, even though judge and jury should be perfectly convinced of its truth, seems to be a violation of the principles of common sense, the dictates of morality, and the sanctity of a juror's oath. . . . Nor, if we inquire into the foundation of the rule, shall we find in it anything certain or fixed, such as ought to be the basis of an uniform and never varying rule. We shall be told by one that it is the moral guilt of the witness which produces this, as it were, practical incompetency; whilst another ascribes it to the desire which he has to purchase impunity for his own transgression. If it be the moral guilt of the witness that affects his

credit, the degree to which his credit is affected must depend upon and vary with the magnitude of the crime of which each witness confesses himself to be guilty. Crimes are of every different shade, from the most venial petit larceny to the most atrocious murder. Yet to all the rule equally applies. The witness who on cross-examination confesses that he has been engaged in many murders, appears more stained with guilt than he who comes forward as an accomplice in the petit larceny then under trial; yet the former is without the scope of the rule, whilst the latter comes entirely within the sphere of its application. The testimony of the same witness may in one trial be absolutely rejected under the operation of the rule, and in the very next trial, in the course of the same day, it may be permitted to go to the jury; yet his moral character has undergone no change in the interval. Moral guilt, then, can never afford any rational foundation for a rule which applies indiscriminately to the highest and to the lowest degrees of that guilt.—But an accomplice, we are told, comes forward to save himself, and his credit is affected by the temptation which this holds out to forswear himself. But who is it that establishes his guilt? He himself—he is his own accuser; and the proof, and often the only proof which can be had, of his guilt, comes from his own lips. He is generally admitted as a witness from the necessity of the thing, and from the impossibility without him of bringing any of the offenders to justice. If this be the foundation of the rule, it rests on a shifting sand. The temptation to commit perjury which influences his credit must be proportioned to the punishment annexed to the crime of which the witness confesses himself guilty. But the rule applies with equal force to the accomplice who may apprehend but a month's imprisonment for the most trifling petit larceny, and to him who may reasonably dread death for an atrocious murder. Universal and undiscriminating, the rule levels all distinctions. Where then is the necessity for, or good sense in, such a rule? Why not leave the credit of the accomplice to be dealt with by the jury, subject to such observations upon it from the judge as each particular case may suggest? . . . That persons whom the interest of the community requires, and the principles of sound policy invite to come forward, should not be marked by a rule which has not been deemed necessary in the case of more atrocious offenders not appearing in the character of accomplices, seems to me to be what is required by reason and good sense.' " (Chief Baron Joy, Evidence of Accomplices 4 (1844) quoted by 7 Wigmore, Evidence, *supra*, § 2057, pp. 417-418.)

There are also modern critics. (See generally, Comment, *Comment on Recent Cases, supra*, 7 Cal.L.Rev. 272, 275 ["The statute itself often works a miscarriage of justice."]; Comment, *Accomplice Corroboration—Its status in California, supra*, 9 UCLA L.Rev. 190.) One, former Ventura County District Attorney Roy A. Gustafson, wrote: "Very often the only evidence of

a crime is the testimony of a participant. Here, again, the defendant cannot be convicted. Thus in a case where the defendant committed sodomy upon two 14-year-old boys, his conviction was reversed because it rested upon the uncorroborated testimony of accomplices. 'The statutory requirement of corroboration is based primarily upon the fact that experience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity.' Is it not, however, sufficient to caution the jury about these factors as the statute requires and permit the jury, if it believes the testimony, to base its verdict thereon? That question is answered affirmatively in the federal courts. The California requirement of corroboration confuses the jury with collateral issues as to whether a witness is an accomplice and whether the accomplice's testimony has been corroborated. Furthermore, because the definition of accomplice excludes many partners in crime it often happens that 'one who has in some essential way furthered the commission of the crime for which defendant is charged, who is himself guilty of a related offense, and who unquestionably hopes for lenient treatment when tried for his own offense, may yet give uncorroborated but effective testimony concerning the defendant's commission of the crime charged.'

"Experience tells us that the greatest source of injustice in the form of conviction of innocent men is the erroneous identification by eye-witnesses. Yet the testimony of a customer in a bank who gets a fleeting glimpse of the robber and who identifies defendant as the man he saw is enough to convict the defendant, but the testimony of three or four of defendant's partners, if uncorroborated, is insufficient under our law. Certainly with cautionary instructions to the jury, accomplices' testimony alone ought to be recognized as just as reliable as other evidence which we now consider sufficient upon which to base a conviction." (Gustafson, *Have We Created A Paradise For Criminals?* (1956) 30 So.Cal.L.Rev. 1, 12, fns. omitted.)

The instant case illustrates the irrationality of the rule.

Under the mandate of Penal Code section 1111, the trial court instructed the jury Genessa Geddry was an accomplice to the residential burglary; as to that offense, her testimony had to be corroborated; and as to that offense, her testimony "ought to be viewed with distrust." (CALJIC Nos. 3.10, 3.18.)

These instructions flaunted common sense. By every measure of experience and reason, Genessa's testimony concerning the residential burglary should have been (and no doubt *was*) viewed with trust, not distrust.

First, Genessa had no "expectation of conditional clemency." *Before* she testified, she had admitted the truth of the juvenile petition filed against her

and had already served her time in custody. Therefore she had nothing to gain by her testimony and, in Wigmore's words, "the whole basis of distrust fails." (7 Wigmore, Evidence, *supra*, § 2057, p. 417.)

Second, her testimony was congruent with the assistant manager's testimony (which recapitulated her "blow by blow" description of the burglary during her 15- to 20-minute 9-1-1 telephone call), consistent with the testimony of Martinez, Harry Slaughter, and Timothy Petersen, and corroborated by physical evidence.

Third, rather than minimize her involvement and magnify appellant's, she did the opposite. Genessa testified she, appellant, and Martinez did *not* discuss committing a burglary. Yet, she readily testified, it was she who broke the bathroom window, she who climbed in the window, and she who then opened the front door.

Fourth, Genessa was unmistakably biased in appellant's *favor*. Her appearance for the prosecution was compelled, her testimony grudging, her love for appellant unequivocal and readily admitted. By any criteria—other than the law's—any testimony by Genessa inculpatory of appellant ought to have been viewed, not with distrust, but with trust.

But not only did the mandatory instruction require the jury to view Genessa's trustworthy testimony with distrust, it allowed her *un*trustworthy testimony to be viewed *without* distrust.

When asked about appellant's involvement in the murder, Genessa feigned forgetfulness. When asked about her statements to the police that appellant had used the stolen .38-caliber weapon, she denied making the statements. She *denied* appellant described the murder victim, *claimed* she *assumed* the victim had blond hair, and finally conceded that if it was in the tape transcript, appellant must have told her the victim was "a white guy with long hair."

The exasperated trial court had this sidebar reaction: "Everyone knows she's lying through her teeth. She still loves the guy. She's an idiot."

But since none of this testimony related to Genessa's accomplice role in the residential burglary, it was *not* to be viewed without distrust.

Also perversely exempt from "distrust" was the entire testimony of non-accomplice Gerardo Acosta. Although he admitted involvement in cocaine selling, admitted stealing $100 from the dead or dying Gerald McNally, did

not summon aid for McNally, and did not inform the police about appellant —the last person seen with an alive McNally—*his* testimony was *not* to be viewed with distrust.

Conversely, *all* of Michael Martinez's testimony was to be viewed with distrust because the law said he was an accomplice and posed a danger. " 'The danger is that when a man is fixed, and knows that his own guilt is detected, he purchases immunity by falsely accusing others.' " (Lord Abinger's remarks in *R.* v. *Farler* (1837) quoted in 7 Wigmore, Evidence, *supra*, § 2057, p. 417.)

But Martinez had not been "fixed" and he knew his own guilt had *not* been detected—yet he voluntarily contacted Detective Buscarino and then voluntarily provided evidence of his own guilt. What Martinez purchased was not immunity but imprisonment of perhaps 10 years and 8 months. And to complete that "purchase" he was required not to "falsely accus[e] others" but to testify truthfully. By all indications he did so. Other witnesses corroborated his testimony. None contradicted it. And yet, the jury was told, this witness—without whose assistance there would have been no trial— must be viewed with distrust.

And what of David Murth? He was, the jury was told, an accomplice to the robberies of James Kluber and Joel Bromley and the attempted robbery of Erlinda Gibbons but not an accomplice to the burglary of Harry Slaughter or murder of Gerald McNally. So as to those robberies and attempted robbery his testimony had to be viewed with distrust and had to be corroborated but as to the burglary and murder his testimony did *not* have to be viewed with distrust or corroborated.

So how should a conscientious juror have regarded Murth's testimony that appellant pointed a .38-caliber revolver at Joel Bromley and robbed him of $20? Surely with "distrust." But since that testimony was relevant to the murder of McNally—killed by a .38-caliber bullet—and since Murth was *not* an accomplice to that offense, how should this same testimony be viewed with respect to the murder?

And what to do about Murth's testimony that afterwards he saw appellant discard the gun in a garbage can? Could that testimony be used to corroborate Murth's testimony concerning the Bromley robbery? Although an accomplice cannot corroborate an accomplice (CALJIC No. 3.13), can the non-accomplice testimony of a witness corroborate his accomplice testimony?

Such legal incomprehensibility—despite strong and uncontradicted evidence appellant attempted to rob Erlinda Gibbons—no doubt frustrated an Erlinda Gibbons attempted robbery verdict.

Accomplice law and injustice are not strangers. A defendant's conviction of sex perversion was overturned despite the testimony of Joan, an accomplice, that she engaged in the acts with defendant and despite her authentication of the motion picture which depicted those acts. (*People* v. *Bowley* (1963) 59 Cal.2d 855 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].)

In *People* v. *Wallin* (1948) 32 Cal.2d 803 [197 P.2d 734] a friend helped Mrs. Paz bury her four-year-old spastic daughter after Mrs. Paz had strangled her. By the time the friend—defendant Morton Wallin—was tried for being an accessory after the fact, Mrs. Paz had been convicted of second degree murder and was serving her state prison sentence.

Mr. Wallin's conviction was reversed because the trial court had not instructed the jury that Mrs. Paz was an accomplice to the burying of the daughter she had strangled.

In the instant case, had appellant testified—with all the self-interest of one facing a life without possibility of parole sentence—the jury would *not* have been told to view his testimony with distrust—even if he testified to being an accomplice!

As Witkin explains, "The instruction was developed in order to make the admission of accomplice testimony against the defendant fair; where he gives testimony *favorable* to the defendant, there is no basis for the suspicion that he is attempting to earn clemency or leniency, and the instruction should not be given. This is so whether the accomplice was called by the defendant or by the People." (3 Witkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1769, p. 1723.)

As I have indicated, accomplice rules are neither consistent nor comprehensible. They apply to an accomplice's prior inconsistent statements (*People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485]; 3 Witkin, Cal. Evidence, *supra*, Introduction of Evidence at Trial, § 1767, pp. 1721-1722) but not to his excited utterance (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1230 [283 Cal.Rptr. 144, 812 P.2d 163]). They apply to criminal trials where guilt must be proved beyond a reasonable doubt but not to juvenile proceedings where allegations have to be proved beyond a reasonable doubt. (*In re Mitchell P.* (1978) 22 Cal.3d 946 [151 Cal.Rptr. 330, 587 P.2d 1144].)

Whatever its origins, today, the accomplice corroboration rule cannot be justified. The federal courts (see, e.g., *United States* v. *Turner* (9th Cir. 1975) 528 F.2d 143, 161) and half the states (7 Wigmore, Evidence, *supra*, § 2056, pp. 407-416) do not have it. Neither should California. The Legislature should repeal Penal Code section 1111.

Similarly without purpose is the decisional mandate (e.g., *People* v. *Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704]) that a trial court instruct a jury to view an accomplice's testimony with distrust. Once required by statute (Code Civ. Proc., former § 2061, subd. 4), the requirement was supplanted by the Evidence Code, operative January 1, 1967. Section 780 of that code wisely provides neutral criteria applicable to all witnesses:

"Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to any of the following:

"(a) His demeanor while testifying and the manner in which he testifies.

"(b) The character of his testimony.

"(c) The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies.

"(d) The extent of his opportunity to perceive any matter about which he testifies.

"(e) His character for honesty or veracity or their opposites.

"(f) The existence or nonexistence of a bias, interest, or other motive.

"(g) A statement previously made by him that is consistent with his testimony at the hearing.

"(h) A statement made by him that is inconsistent with any part of his testimony at the hearing.

"(i) The existence or nonexistence of any fact testified to by him.

"(j) His attitude toward the action in which he testifies or toward the giving of testimony.

"(k) His admission of untruthfulness."

This statute, incorporated into CALJIC No. 2.20, clearly and completely informs a jury that in determining the credibility of a witness they may consider "any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony . . . ." One such matter is "the existence or nonexistence of a bias, interest, or other motive."

To single out one class of witness, accomplices, who may or may not have a "bias, interest, or other motive," and *require* their testimony to be viewed with distrust (if called by the prosecution but not if called by the defense, if unfavorable to the defense but not if favorable to the defense) is unnecessary, unhelpful, and unfair. Our Supreme Court should relieve the trial courts of this duty and restore to them, unfettered, their constitutional discretion to "make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. X.)

Appellant's petition for review by the Supreme Court was denied January 15, 1997.