Filed 7/10/14  P. v. Ramirez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B245678 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA067665) |
| v. | |
| JUAN CARLOS RAMIREZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed in part, reversed in part, and remanded with directions as to appellants.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Juan Carlos Ramirez.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Emerson Romero.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Stephanie C. Santoro and Seth McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

Appellants Juan Carlos Ramirez and Emerson Romero appeal from the judgments entered following their convictions by jury on four counts of kidnapping to commit robbery (Pen. Code, § 209, subd. (b); counts 2, 4, 6 & 14), following Ramirez's convictions by jury on 10 counts of second degree robbery (Pen. Code, § 211; counts 1, 3, 5 & 7 – 13), and following Romero's convictions by jury on seven counts of second degree robbery (Pen. Code, § 211; counts 1, 3, 5 & 10 – 13) with, as to each above offense, a principal armed with a firearm (Pen. Code, § 12022, subd. (a)(1)). The court sentenced Ramirez to prison for four consecutive terms of life with the possibility of parole, plus a determinate term of seven years. The court sentenced Romero to prison for four consecutive terms of life with the possibility of parole, plus a determinate term of eight years. As to each appellant, we affirm in part, reverse in part, and remand with directions.

*FACTUAL SUMMARY*

1. *People's Evidence*.

    a. *The Cell Zone Crimes (Counts 11 – 14).*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established as follows. On March 10, 2011, Eric Ramirez (Eric) and Ivan Mojica were employees at a Cell Zone store in El Monte. A counter was in the front of the store and a wall separated the store's front and rear areas. No one could see behind the counter. A cash register, safe, valuables, and employees' personal belongings were in the rear area. The store had no back door.

About 8:00 p.m., around closing time, appellants, each possessing a firearm, entered the store. They were wearing sweaters with hoods, and bandanas as masks. Appellants told Mojica to lie down. Eric was behind the wall, counting money. Appellants made Mojica and Eric lie down in the store's rear area and robbed them. Appellants took the money Eric had been counting, money from the cash register, and Eric's cell phone from his back pocket.

Nancy Quezada entered the store and eventually went to the counter. Eric was going to give her a ride home. Appellants approached from the store's rear area. One

told Quezada to lie down. She tried to call 911 but appellants asked for her purse and cell phone. Ramirez had a shotgun and Romero had a gun. Quezada surrendered her purse and cell phone. Appellants discarded the purse, kept the cell phone, and told Quezada to go to the rear area. She complied (count 14). Appellants told Quezada to lie down with Eric and Mojica, and she complied. Appellants later left. The entire incident lasted probably less than five minutes.

The robber with the shotgun was the robbers' leader. Eric and Quezada testified Ramirez had the shotgun and was the shorter robber, but Quezada was not certain Ramirez was the shorter one. Mojica testified the shorter robber was five feet four inches or five feet five inches tall. Mojica testified the taller robber did not have the shotgun and he was about five feet nine inches tall. Quezada testified the taller robber was perhaps five feet eleven inches tall. Quezada testified a photograph in a photographic lineup (People's exh. No. 22) depicted Ramirez and a photograph in a photographic lineup (People's exh. No. 24) depicted Romero.[1]

b. *The Tobacco Shop Robbery (Count 10).*

On April 11, 2011, Hany Gad was an employee at the Tobacco Shop in Burbank. Gad testified as follows. Perhaps five minutes before the 8:00 p.m. closing time, Gad was in the shop and talking on the phone. A man wearing dark clothing, and a bandana as a mask, entered and pointed a gun at Gad. The man took the phone and told Gad to lie down or he would be killed.

---

[1]     About 7:45 p.m. on April 1, 2011, Ramirez and another man entered a Metro PCS store in Van Nuys and robbed employees Mohammed Hamdan, Aber Abualizz, and Pricilla Pinedo (counts 7 – 9). Ramirez concedes Pinedo, during photographic lineups, identified appellants as the robbers. However, as to Romero, the court declared a mistrial and dismissed counts 7 through 9 after the jury was unable to reach a verdict on those counts as to him.

A second man, Ramirez, entered with a shotgun.[2]  Ramirez's face was not covered as he entered the store and Gad got a good look at Ramirez's face.  After Ramirez entered the store he donned a mask.  Ramirez kept asking Gad, "Where is the money?"  Ramirez screamed, "We have to finish before the police arrive."  Ramirez took a bag containing the shop's money.  Either the first man or Ramirez took a hookah.  Gad described the robbers to police as short Hispanics between 25 and 30 years old and wearing dark sweatshirts.  One of the sweatshirts had a logo; the other did not.  Gad did not identify Romero at trial.

c. *The Verizon Crimes (Counts 1 – 6)*.

Before 8:00 p.m., closing time, on April 20, 2011, Grachia Taslgian was an employee in a Verizon store on Balboa Boulevard in Los Angeles County.  The store had a counter and a back office, and the distance between the two was five to seven feet.  A bathroom was located behind the back office, and the distance between the counter and bathroom was 15 feet.  The back office was not visible from outside the store.  Cell phones were in a locked cage in the back office.  Memento $2 bills were taped on a window in the back office.

Taslgian testified as follows.  Srapion Atikyan and Solomon Tibebe were also present in the store.  Atikyan was Taslgian's friend.  Atikyan was not a store employee.  Atikyan was a "coworker" "helping [Taslgian] out."  Atikyan did not work for Taslgian.  Tibebe was Taslgian's friend and a customer.  Taslgian, Atikyan, and Tibebe were wearing regular clothes.

Atikyan testified on April 20, 2011, he was at the store but was not an official employee.  Atikyan previously had helped Taslgian, but Atikyan denied he would go to the back office to restock items.  On April 20, 2011, Atikyan was near the middle of the store, between the front door and the counter.  Tibebe testified he was standing by the

---

[2]     Gad testified Ramirez pointed a "gunshot" (*sic*).  Ramirez concedes in his statement of facts he pointed a gun at Gad.  Romero concedes in his statement of facts Ramirez had a shotgun.

counter and examining headphones.[3] The prosecutor asked Tibebe if Taslgian and Atikyan were also there, and Tibebe replied, "I work there, have a customer." (*Sic.*) Tibebe had come to the store because he had been experiencing a problem with his phone. Tibebe was waiting his turn until other customers had been served.

Appellants entered the store with firearms. The two were wearing dark clothing, hoodies, and bandanas as masks. Atikyan denied remembering what he was doing when the men entered, but he was not milling around like a customer. Tibebe had been in the store about 50 minutes before the men entered. One of the robbers took Tibebe's cell phone and told him to lie down near the counter.[4] Tibebe complied. Atikyan and Tibebe were ordered to go to the back office, they complied, and their wallets were taken.

About 8:00 p.m., Taslgian exited the bathroom and heard yelling. He saw two men wearing dark clothing in the hallway, and one had a gun. Atikyan, Tibebe, and Taslgian were herded into the back office (counts 2, 4 and 6, respectively) and the robbers told the three to lie down. Taslgian's cell phone was taken from him. The keys to the locked cage containing new cell phones were "hanging in the front next to the register." Because appellants mistakenly took Tibebe's keys instead of the cage keys, appellants could not open the locked cage. Appellants ran around shouting, "Where is the money? You got the money?" Money was taken from the register. One of the memento bills was torn.

Hector Molina testified he was across the street from the Verizon store when he saw three men inside it wearing sweatshirts with hoods. The three threw a customer to the floor, then told the rest of the people to move to the back of the store. Some of those people went to the back. One of the three assailants was with the man on the floor, a second assailant was by the door, and the third assailant came from the back. At some

---

[3] Tibebe testified when he was testing headphones, the owner "and his employee" were also in the store.

[4] Tibebe testified when he first realized someone else was in the store and someone had taken his phone from his hand, the store's owner was in the back and "his employee" was in the front.

point one of the three assailants went to the back of the store. Molina was certain there were three assailants wearing sweatshirts with hoods. Molina did not see any of the three assailants leave the store before police arrived. A police officer testified at trial Molina told police there were only two robbers.

About 8:00 p.m., Los Angeles police arrived. Police ordered the occupants of the Verizon store to exit and appellants complied. Ramirez exited first wearing a bandana around his neck. Los Angeles Police Officer John Nguyen testified a photograph (People's exh. No. 40) depicted Ramirez wearing the clothing he was wearing when he exited the store. The photograph depicts Ramirez wearing a sweatshirt with a hood lowered in the back. The sweatshirt has the logo "SOUTHPOLE" (Peo. Exh. No. 40) in large white letters. Romero exited with a bandana masking half of his face. Police arrested appellants.

Various property was taken during the Verizon robberies but one item police recovered was Quezada's previously mentioned cell phone. Police found in Ramirez's pocket the other half of the previously mentioned torn memento bill. Police found a handgun and pellet gun in a trash can in the Verizon store. The handgun was taken during the Metro PCS robbery and belonged to Hamdan. A police officer testified Ramirez was five feet nine inches tall and Romero was five feet three inches tall.

2. *Defense Evidence.*

In defense, Ramirez essentially testified he committed the acts that otherwise constituted all of the above robberies except he committed those acts under duress. Ramirez testified he worked in a restaurant and Daniel became his new employer. One night, Daniel and another person entered the restaurant. Daniel had a shotgun, pistol, and a bag containing cell phones. When Daniel realized Ramirez had seen these things, Daniel became upset. Daniel, pointing a gun at Ramirez's head, said Ramirez had to steal too. Ramirez was afraid because Daniel was pointing the gun at him, knew where Ramirez lived, was a gang member, and had 18th Street tattoos.

During the approximate week thereafter, Ramirez did not tell police what had happened. Ramirez testified he was afraid to do so because he was an illegal immigrant and he "could see on the [television]" the police could detain and deport him.

In March 2011, and a week after the above mentioned night, Ramirez was ending his shift at work when Daniel pointed a gun at him and told him they were going to rob or steal. Daniel drove Ramirez to the location where the robbery was to occur and Ramirez committed robbery that day with Romero. Romero had an 18th Street tattoo on his stomach and Ramirez believed Romero was a gang member.

Ramirez committed a total of five robberies with Romero. The five robberies occurred about a week apart. Daniel drove Ramirez to the location of, and threatened Ramirez with a gun before, each robbery. Romero never threatened Ramirez.

Appellants robbed a Metro PCS store and a smoke shop. The jury had seen a video of the smoke shop robbery and the video depicted Ramirez's face. Ramirez never went to the police because he was afraid for his family.

However, Ramirez testified he told police the following. Ramirez met Romero in downtown Los Angeles only a week before their April 20, 2011 arrest. Romero told Ramirez that Romero did not work but made good money, and Romero invited Ramirez to join him. On April 20, 2011, Ramirez arrived at the Verizon store by bus with Romero. Once appellants arrived, Romero told Ramirez they were going to commit robbery. Ramirez committed the Verizon robbery because he needed money for his family. Ramirez committed no other robbery.

Ramirez testified he falsely told police he arrived at the Verizon store by bus with Romero, falsely told police he committed the Verizon robbery voluntarily, and falsely told police he committed that robbery because he needed money for his family. One reason Ramirez lied to police was, after appellants had been arrested and were in separate patrol cars, Romero was yelling to Ramirez not to say anything. After Ramirez's family moved, he testified at trial.

Romero presented no defense witnesses.

3. *Rebuttal Evidence*.

Los Angeles Police Officer Gus Ramirez (Officer Ramirez) testified that on April 21, 2011, he spoke with appellant Ramirez and appellant Ramirez never mentioned a person named Daniel. Appellant Ramirez told Officer Ramirez that on April 20, 2011, appellants tossed their guns in a store trash can once appellant Ramirez saw police outside. Officer Ramirez testified the Los Angeles Police Department (LAPD) had a policy regarding reporting crime victims to immigration authorities. Pursuant to a 1979 directive from the chief of police, LAPD did not report crime victims to Immigration and Customs Enforcement. LAPD had made a point to publicize that policy.

## ISSUES

Appellants claim insufficient evidence supports their aggravated kidnapping convictions. Ramirez also claims (1) the trial court erred by admitting into evidence LAPD policy concerning reporting illegal aliens, (2) the trial court erroneously instructed the jury appellant Ramirez's testimony required corroboration if he was an accomplice, (3) cumulative prejudicial error occurred, and (4) Ramirez's abstract of judgment must be corrected. Romero also claims (1) insufficient evidence supports his second degree robbery conviction (count 10) and (2) the trial court erroneously failed to give accomplice instructions as to count 10.

## DISCUSSION

1. *Sufficient Evidence Supports Appellants' Aggravated Kidnapping Convictions, Except as to Count 6.*

Appellants claim insufficient evidence supports their aggravated kidnapping convictions. (Pen. Code, § 209, subd. (b); counts 2, 4, 6 & 14). We disagree except as to count 6 involving victim Taslgian. "Kidnapping to commit [robbery] involves two prongs. First, the defendant must move the victim and this asportation must not be 'merely incidental to the [robbery].' [Citations.] Second, the movement must increase 'the risk of harm to the victim over and above that necessarily present in the [robbery].' [Citation.] The two are not mutually exclusive, they are interrelated. (*People v. Rayford* (1994) 9 Cal.4th 1, 12 . . . [(*Rayford*)].)" (*People v. Shadden* (2001) 93 Cal.App.4th 164, 168 (*Shadden*).)

"For the first prong, the jury considers the distance the defendant moved the victim and the 'scope and nature' of the movement. [Citations.]" (*People v. Shadden*, *supra,* 93 Cal.App.4th at p. 168.) There is no minimum number of feet a defendant must move the victim in order to satisfy the first prong. (*Ibid*.) Where movement changes the victim's environment, it does not have to be great in distance to be substantial. (*Id.* at p. 169.) The mere fact movement of a robbery victim facilitates, or is necessary to, a robbery does not necessarily mean movement is merely incidental to the robbery. (*People v. James* (2007) 148 Cal.App.4th 446, 454-455 (*James*).) A movement unnecessary to a robbery is not incidental to it. (*Id.* at p. 455, fn. 6.)

The second prong "includes consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, the attacker's enhanced opportunity to commit additional crimes," and the possible enhancement of danger to the victim resulting from the movement. (Cf. *Rayford*, *supra,* 9 Cal.4th at pp. 13-14.) Examples of such risk include unforeseen intervention by third parties. (*Id.* at p. 13.) The fact these dangers do not materialize does not mean the risk of harm was not increased. (*Id.* at p. 14.)[5]

As for count 14 involving Quezada, and the first prong, robbery does not require asportation of the victim. Appellants took Quezada's property before they moved her. Once appellants took her property, the robbery was complete for purposes of establishment of guilt. (*People v. Cooper* (1991) 53 Cal.3d 1158, 1163.) Nonetheless, there was substantial evidence after appellants took Quezada's cell phone, appellants made Quezada, a nonemployee, walk from the counter to the rear of the store, then made her lie down. This movement was not necessary to, nor did it facilitate, the robbery of

---

[5]     We note Romero argues the second prong requires the movement "substantially" increase the risk of harm to the victim over and above that necessarily present in the robbery itself. However, in 1997, the Legislature amended Penal Code section 209, subdivision (b)(2) with the results at the time of Romero's 2011 offenses, the word "substantially" did not appear in that subdivision and the second prong did not require movement that "substantially" increases the risk of harm to the victim. (*People v. Vines* (2011) 51 Cal.4th 830, 870, fn. 20.)

Quezada.  This is not a situation in which appellants were simply moving a store employee to a location in the store where store property was kept.  There is no evidence Quezada had property in the rear of the store.

Appellants took no additional property from Quezada once she was in the rear of the store.  Appellants changed Quezada's environment from the store's front area to the store's rear area behind a wall.  No minimum amount of steps was required to satisfy the first prong.  We conclude there was sufficient evidence appellants moved Quezada and the asportation was not merely incidental to the robbery of Quezada.

As to the second prong, appellants made Quezada travel the distance from the store's front area to its rear area under threat of imminent lethal force from a firearm.  Appellants took Quezada's cell phone before moving her, thus increasing her isolation.  The store had no back door.  Appellants' movement of Quezada from the front area to the rear area, the latter of which was less exposed to public view, decreased the likelihood of detection, increased the danger inherent in her foreseeable attempt to escape, and enhanced appellants' opportunity to commit additional crimes, including physical and/or sexual assault upon Quezada.  The movement also increased the risk of psychological harm to her.  (Cf. *People v. Nguyen* (2000) 22 Cal.4th 872, 874, 886.)

Moreover, appellants moved Quezada to the store's rear area so they could search for *store* property.  This increased the risk of retribution upon Quezada if appellants did not find store property, i.e., property over which she had no control.  Further, " 'a kidnap victim's peril ordinarily grows with the passage of time and distance.' " (*James, supra,* 148 Cal.App.4th at p. 458, quoting *People v. Stathos* (1971) 17 Cal.App.3d 33, 39.)  The risk to Quezada included unforeseen intervention by third parties, such as Eric and/or Mojica.  We conclude there was sufficient evidence appellants' movement of Quezada increased the risk of harm to her over and above that necessarily present in her robbery.

In *James*, this division concluded robbery of a *business employee* includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises, but "*does not* include the risk that *other* individuals [in *James*, a maintenance employee] will be moved, at gunpoint, from the relative safety of the outdoors, into the business premises for the duration of the robbery." (*James*, *supra,* 148 Cal.App.4th at p. 457.) Similar reasoning applies here, where appellants moved Quezada, who was not even an employee, from the store's front area to its rear area. We hold as to count 14 there was sufficient evidence appellants committed kidnapping to commit robbery. (Cf. *Rayford*, *supra,* 9 Cal.4th at pp. 12-14; *James*, at p. 457; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1048-1052; *Shadden*, *supra,* 93 Cal.App.4th at pp. 168-170.)

A different analysis applies to count 6, involving Taslgian. In *People v. Washington* (2005) 127 Cal.App.4th 290 (*Washington*), a decision by this division, the defendants committed bank robbery. *Washington* concluded the movement of the victims was insufficient to support a conviction for aggravated kidnapping. *Washington* observed, "We reach this conclusion because the movement occurred entirely within the premises of the bank and each victim moved the shortest distance between their original location and the vault room. Thus, there was no excess or gratuitous movement of the victims over and above that necessary to obtain the money in the vault. Also, given that the cooperation of two bank employees was required to open the vault, the movement of both [victims] was necessary to complete the robbery. After appellants took the money from the vault, they left quickly and without incident." (*Id*. at p. 299.)

*Washington* later stated, "the movement in this case must be seen as equivalent to the movement of victims to the location of safes in offices or locations out of public view in other types of businesses. [Citations.]" (*Washington, supra,* 127 Cal.App.4th at p. 300.) *James* stated, "As a general rule, 'when in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him . . . his conduct generally will not be deemed to constitute [aggravated kidnapping].' [Citation.] This is true whether the robbery is residential or commercial. This is because

'. . . *robbery of a business owner or employee* includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises.' " (*James*, *supra,* 148 Cal.App.4th at p. 455-456, quoting *Washington*, *supra,* 127 Cal.App.4th at p. 300, italics and second ellipsis added.)

We have recited the pertinent facts concerning what happened to Taslgian. Essentially, he was a store employee whom appellants moved directly to the back office, then robbed him of his cell phone and store property. We hold there was insufficient evidence appellants kidnapped Taslgian to rob him (count 6).[6]

Counts 2 and 4 involved Atikyan and Tibebe, respectively, and there was substantial evidence neither was an employee of the Verizon store. The analysis as to Atikyan and Tibebe is largely the same as the analysis as to Quezada. Ramirez concedes Atikyan was not a store employee. Ramirez also concedes as to the Verizon crimes that people other than employees were robbed. We hold there was sufficient evidence supporting appellants' convictions on each of counts 2 and 4 for kidnapping to commit robbery.

---

[6] Ramirez's prison sentence included a two-year low term on count 10, and the court stated it was choosing not to impose the Penal Code section 12022, subdivision (a)(1) enhancement as to counts 2, 4, 6 (which we are reversing), 7 through 11, 13, and 14. When sentencing Romero, the court stated it was choosing not to impose the Penal Code section 12022, subdivision (a)(1) enhancement as to counts 2, 4, 6 (which we are reversing) and 14. The trial court's entire sentencing scheme suggests the trial court may have wanted appellants' total prison sentences to be greater than they would be if we merely reversed appellants' convictions on count 6, and since it appears the trial court had discretion to impose a greater sentence, we will vacate appellants' sentences and remand for resentencing. (Cf. *People v. Stevens* (1988) 205 Cal.App.3d 1452, 1455-1458.) We express no opinion as to what appellants' new sentences, or any component(s) thereof, should be.

2. *The Trial Court Did Not Err by Admitting Into Evidence Officer Ramirez's Rebuttal Testimony About LAPD Policy.*

As mentioned, appellant Ramirez testified one night Daniel pointed a gun at appellant Ramirez's head and told him he had to steal. During the approximate week thereafter, appellant Ramirez failed to tell police what had happened because he was an illegal immigrant and he "could see on the [television]" the police could detain and deport him. In rebuttal, Officer Ramirez testified about LAPD policy as reflected in the Factual Summary.

Appellant Ramirez claims Officer Ramirez's above testimony was irrelevant. We disagree. The trial court reasonably could have concluded appellant Ramirez's testimony about his supposed reason for failing to tell the police what had happened was relevant not merely to explain his failure to tell police in general a week after Daniel allegedly pointed the gun at him, but to explain appellant Ramirez's failure to tell Los Angeles police when he was arrested.

Officer Ramirez's rebuttal testimony thus had a tendency in reason to impeach appellant Ramirez's testimony, because LAPD had made a point of publicizing its policy. Appellant Ramirez did not, following Officer Ramirez's testimony about the policy, deny appellant Ramirez had heard about it. The trial court did not abuse its discretion, or violate appellant Ramirez's right to due process, by ruling evidence of the LAPD policy was relevant. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717; Evid. Code, § 210.)

Moreover, even if the trial court erred as urged by appellant Ramirez, the jury reasonably could have concluded his explanation as to why he did not tell police about Daniel was self-serving and fabricated. Further, that explanation was not appellant Ramirez feared Daniel, an explanation that would have related more directly to appellant Ramirez's duress defense, but to the issue appellant Ramirez feared deportation.

Further, there is no dispute as to the sufficiency of the evidence appellant Ramirez committed 10 violent robberies (counts 1, 3, 5, 7 – 13) and we have concluded there was sufficient evidence he committed three violent aggravated kidnappings (counts 2, 4

& 14).  The jury reasonably could have disbelieved appellant Ramirez committed these 13 violent crimes against several victims because he feared one lawful nonviolent deportation.  Moreover, these 13 offenses were crimes of moral turpitude, impeaching his claim he failed to tell police what happened because of a fear of deportation.

Finally, appellant Ramirez's duress defense itself was weak.  There was no evidence Daniel, the person who allegedly threatened appellant Ramirez, was present during any of appellant Ramirez's acts that were otherwise crimes.  Indeed, except for appellant Ramirez's testimony, there was no evidence Daniel existed, much less that he was appellant Ramirez's employer.  Appellant Ramirez's suggestion Daniel and Romero were members of the 18th Street gang did not supply duress.  Appellant Ramirez told police he committed one robbery with Romero and told police he committed that robbery voluntarily.  Appellant Ramirez repeatedly testified he lied to police.  As against the weak defense evidence of duress, there was ample evidence appellant committed 13 crimes of moral turpitude that impeached his duress defense.

In sum, any state law trial court error in admitting evidence about LAPD's policy was harmless under any conceivable standard.  (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).)

3.  *The Trial Court Did Not Prejudicially Err by Giving CALCRIM No. 301*.

During its final charge to the jury, the court gave CALCRIM No. 301 that stated, in relevant part, "Except for the testimony of Juan Ramirez [hereafter, Ramirez], which requires supporting evidence if you decide he is an accomplice, the testimony of only one witness can prove any fact."  Ramirez claims the trial court erred by giving this instruction because it did not clarify it applied only to the testimony of Ramirez, as an accomplice, against Romero and not to Ramirez's testimony in his own defense.  We conclude otherwise.

A party may not complain on appeal an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (Cf. *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.) CALCRIM No. 301 was correct in law and responsive to the evidence to the extent it indicated if Ramirez was testifying as an accomplice against Romero, Ramirez's testimony had to be corroborated. Ramirez did not request clarifying or amplifying language concerning the instruction. He waived his instructional issue.

Even if the issue were not waived and the trial court committed state law error by giving CALCRIM No. 301 to the extent it implied Ramirez's testimony in his own defense required supporting evidence, it does not follow we must reverse the judgment. For reasons we previously have discussed, Ramirez's explanation as to why he did not go to police, as well as his duress defense, were weak. Ramirez concedes no supporting evidence was presented to bolster the testimony he gave for his duress defense. On the other hand, the evidence Ramirez committed the offenses of which he was convicted (except for count 6) was strong. It is not reasonably probable the jury would have believed Ramirez's explanation or defense even if the challenged instruction had been clarified. The alleged instructional error was not prejudicial (*Watson*, *supra,* 46 Cal.2d at p. 836) and no due process error occurred.[7]

4. *Sufficient Evidence Supported Romero's Robbery Conviction (Count 10).*

Romero claims insufficient evidence supports his conviction on count 10 for the Tobacco Shop robbery. He argues Ramirez was an accomplice whose testimony Romero robbed the Tobacco Shop was not sufficiently corroborated. We reject Romero's claim.

There is no dispute two people including Ramirez committed the Tobacco Shop robbery involving Gad. The issue is whether the requisite slight or circumstantial

---

[7] In light of our previous discussion, we reject Ramirez's claim cumulative prejudicial error occurred. Moreover, since we are remanding for resentencing (see fn. 6, *ante*), there is no need to reach Ramirez's claim his abstract of judgment and sentencing minute order must be amended because they erroneously reflect the trial court imposed a Penal Code section 12022, subdivision (a) enhancement as to count 10.

corroborating evidence (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*)) existed Romero was the second robber.

Romero does not challenge the sufficiency of the evidence he committed the Cell Zone robberies (counts 11 - 13) or the Verizon robberies (counts 1, 3 & 5). We previously have concluded there was sufficient evidence he committed the aggravated kidnapping of Quezada (count 14) during the Cell Zone crimes, and the aggravated kidnappings of Atikyan and Tibebe (counts 2 & 4) during the Verizon crimes. That is, there was substantial evidence not merely that Ramirez and an accomplice committed the above crimes, but that Romero was the accomplice.

Proof a defendant committed other recent and similar offenses tending to show a consistent plan or method of misconduct is admissible to prove the particular crime charged, and such evidence may corroborate an accomplice's testimony. (*People v. Barillas* (1996) 49 Cal.App.4th 1012, 1021-1022 (*Barillas*).)

For the reasons discussed below, we conclude the very number of these crimes Ramirez *and Romero* committed, their facts, and the commonalities between those facts and the facts of the Tobacco Shop robbery, provide the requisite corroborating evidence Romero was Ramirez's accomplice in the Tobacco Shop robbery.

The Cell Zone crimes occurred on March 10, 2011, in Los Angeles County. The Verizon crimes occurred on April 20, 2011, in Los Angeles County. The Tobacco Shop robbery occurred on April 11, 2011, in Los Angeles County, i.e., between the Cell Zone and Verizon crimes. The Cell Zone, Tobacco Shop, and Verizon crimes together may be described as a crime spree in Los Angeles County. Every time Ramirez committed a crime in this case with an identified accomplice, Romero was an accomplice.

The Cell Zone and Verizon crimes, which Ramirez and Romero committed, occurred about 8:00 p.m., i.e., closing time for those stores. The Tobacco Shop robbery, which Ramirez and an accomplice committed, occurred about 8:00 p.m., i.e., closing time. Two, and only two, culprits (Ramirez and Romero) committed the Cell Zone crimes. There was substantial evidence two, and only two, culprits (Ramirez and

Romero) committed the Verizon crimes. Two, and only two, culprits (Ramirez and an accomplice) committed the Tobacco Shop robbery.

There was substantial evidence that during the Cell Zone and Verizon crimes, each appellant had a firearm, wore a bandana as a mask, and wore a sweatshirt. During the Cell Zone crimes, appellants had a shotgun and handgun, respectively. During the Verizon crimes, one of the appellants had a handgun. During the Tobacco Shop robbery, Ramirez and his accomplice had a shotgun and a gun, respectively, both persons eventually wore masks, the mask of Ramirez's accomplice was a bandana, and both persons wore sweatshirts. During the Verizon crimes, appellants wore dark clothing. During the Tobacco Shop robbery, Ramirez and his accomplice wore dark sweatshirts, and Ramirez's accomplice wore dark clothing.

There was substantial evidence that during the Cell Zone crimes committed by appellants, Ramirez had the shotgun and seemed to be more in charge. During the Tobacco Shop robbery, Ramirez had a shotgun and screamed to his accomplice, "We have to finish before the police arrive." During the Verizon crimes, the robbers were shouting, inter alia, "Where is the money." During the Tobacco Shop robbery, Ramirez asked Gad, "Where is the money?"

When Ramirez exited the Verizon store after committing the Verizon crimes with Romero, Ramirez was wearing a sweatshirt that said "SOUTHPOLE." A video of the Tobacco Shop robbery depicts Ramirez wearing a sweatshirt. We have viewed the video and, although it is grainy, the jury reasonably could have concluded that sweatshirt said, "SOUTHPOLE." We have reviewed photographs of Ramirez and Romero (People's exh. Nos. 22 and 24, respectively). The jury reasonably could have concluded appellants were male Hispanics. Gad testified the Tobacco Shop robbers were male Hispanics. A police officer testified Ramirez was five feet nine inches tall and Romero was five feet three inches tall. Gad testified the Tobacco Shop robbers were short.

We conclude there was the requisite "slight" (*Abilez, supra,* 41 Cal.4th at p. 505) corroboration evidence Romero was Ramirez's accomplice in the Tobacco Shop robbery; therefore, Ramirez's testimony and the corroborating evidence provided sufficient

evidence to convince a rational trier of fact, beyond a reasonable doubt, Romero was one of the Tobacco Shop robbers. (Cf. *Barillas, supra,* 49 Cal.App.4th at pp. 1021-1022.)

5. *The Trial Court Did Not Err by Failing to Give Accomplice Instructions as to Count 10.*

Romero claims the trial court erred by failing to give accomplice instructions as to count 10. He argues Ramirez was an accomplice as a matter of law and the trial court erred by failing to give accomplice instructions indicating Ramirez was an accomplice, either as a matter of fact or a matter of law, whose testimony required corroboration and was to be viewed with distrust. We disagree.

Where " '. . . a defendant testifies in his own behalf and denies guilt while incriminating a codefendant, it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 562 (*Avila*), quoting *People v. Terry* (1970) 2 Cal.3d 362, 399.)[8] Ramirez testified on his own behalf, denying guilt by his duress defense while incriminating Romero. The trial court had no duty to give accomplice instructions as to count 10.

Moreover, as Romero concedes, the failure of a trial court to instruct on accomplice liability under Penal Code section 1111 is harmless if there is sufficient corroborating evidence in the record. (*People v. Williams* (2008) 43 Cal.4th 584, 636-638; *People v. Lewis* (2001) 26 Cal.4th 334, 370.) We have concluded in part 4 of our Discussion there was sufficient corroborating evidence Romero was the second robber in the Tobacco Shop robbery.

Finally, as mentioned, the court gave to the jury CALCRIM No. 301, that stated Ramirez's testimony required supporting evidence if the jury decided he was an

---

[8]     *Avila* stated previous California Supreme Court decisions made clear "a trial court *should* instruct the jury that, to the extent a codefendant's testimony tends to incriminate a defendant, it should be viewed with care and caution and is subject to the corroboration requirement." (*Avila, supra*, 38 Cal.4th at p. 562.) However, *Avila* added, "We need not decide, however, whether the court *erred* because any error in this regard was nonprejudicial." (*Ibid*., italics added.)

accomplice.  To that extent, CALCRIM No. 301 implied a corroboration requirement and was not merely cautionary but preclusive.  The alleged instructional failure by the trial court was not prejudicial.  (Cf. *Lewis*, *supra,* 26 Cal.4th at pp. 370-371.)

## *DISPOSITION*

The judgments of appellants are affirmed, except the convictions of appellants for kidnapping to commit robbery (count 6) are reversed, appellants' sentences are vacated, and the matter is remanded for resentencing as to appellants.  The trial court is directed to forward to the Department of Corrections an amended abstract of judgment as to each appellant.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.