Filed 12/28/21  P. v. McHatton CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C092125 |
| Plaintiff and Respondent, | (Super. Ct. No. 19F4775) |
| v. | |
| CHRISTOPHER EUGENE McHATTON, | |
| Defendant and Appellant. | |

Defendant Christopher Eugene McHatton killed Steven Johnson with a hammer.  At trial, defendant testified that he was sleeping in a shed with Johnson and woke up to find Johnson orally copulating him.  Defendant pushed Johnson off and punched him, which led to a fistfight between the two.  When Johnson started swinging a four-by-four at defendant, he grabbed a hammer and hit Johnson repeatedly on the head.  A jury convicted defendant of second degree murder.

Defendant contends the trial court erred by modifying CALCRIM No. 570, the pattern instruction on voluntary manslaughter in a heat of passion, to include language from Penal Code section 192, subdivision (f), which provides that discovery of the sexual

orientation of the victim, including in the course of nonforcible, unwanted romantic or sexual advances, is not objectively reasonable provocation to reduce murder to manslaughter. Defendant argues this instruction was inapplicable to the facts and evidence presented at trial and misled the jury to conclude that Johnson's conduct could not be objectively reasonable provocation. We agree and reverse the judgment.

In addition, for guidance on remand, we explain that the trial court did not err in rejecting defendant's request to insert in CALCRIM No. 505, the pattern instruction on self-defense, reference to oral copulation and sodomy as "forcible and atrocious" crimes from which defendant could justifiably defend himself. We do not address defendant's other contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Pretrial

Defendant was charged in a criminal complaint with the murder of Johnson (count 1, Pen. Code, § 187, subd. (a))[1] and destruction of evidence (count 2, § 135). The complaint further alleged that defendant used a deadly weapon in committing the murder (§ 12022, subd. (b)).

### II.    Trial

#### A.     Prosecution's Case

On July 23, 2019, around 5:30 p.m., police officers were dispatched to a residence in Redding on a call from a resident who rented a room in the house about a possible suicide and were directed to a shed in the back of the property. Inside, police discovered a body lying motionless on his back in a large amount of blood, apparently deceased. There was a towel over his face and neck. The body was cold to the touch and had no

---

[1] All undesignated statutory references are to the Penal Code.

signs of life. The scene was extremely bloody, with blood spattered on the door and shoe prints in the blood drying on the floor.

A Redding police investigator arriving at the scene saw no signs of forced entry in the shed. There was blood on the door handles. Inside the shed on the left was a door to a small room that appeared to be a bathroom under construction. At the far end was a wooden ladder that led to a loft with a mattress. The bottom area was like a living room and the upper area a bedroom. A body that police thought to be Johnson was in the living room. There was blood throughout the living room part of the shed. A pillow was resting on Johnson's leg, a sleeping bag was near his left arm, and a shirt and towel were wrapped around his head.

The index finger on Johnson's right hand was bruised and distorted, as if broken. The knuckles on his left hand were also bruised. The right side of his head was bleeding. Next to his left arm was a four-by-four piece of wood with blood on the sides. Two nails protruded from one end. There were shoe prints in a checkered pattern from a Vans shoe in the blood around and under Johnson's body. A black Vans cap was on a nightstand. Several rungs of the ladder to the loft had blood in a checkered shoe pattern on them. Next to the mattress in the loft was a hammer with blood where the handle and head met and inside the claws of the hammer.

The police investigator found a glass mirror in the shed with a substance that appeared to be crystalline methamphetamine. Photos of the shed showed a glass pipe used for smoking methamphetamine.

Russell Hunt owned the property, inherited from his parents in 2016. He rented out rooms in the house. There are two sheds on the property, one of which was a premade shed that Hunt added in 2016. Johnson initially lived in the house and then moved to that shed.

Johnson's body was discovered by Onesaeng Sayavong (known as "Ed"), who lived in the house and had gone to Johnson's shed to share some food with him. Ed

3

opened the door and saw Johnson's body on the floor with blood around him and a towel around his head. Ed ran back to the house to tell the others to call an ambulance. When nobody did anything, Ed called 911. The last time Ed saw Johnson was after 5:00 p.m. the previous day, July 22.

On July 22, Johnson asked another resident of the house, Sergio Brambila, to buy him some shots of alcohol. Brambila and Johnson drove to a liquor store a few blocks away. A young man arrived separately in a small blue/gray car and went in with Brambila and Johnson. The young man was a friend of Johnson's; Brambila had seen him a few times before. The young man was five foot 10 or 11, Caucasian, in his twenties, wearing glasses. The man wearing glasses was defendant.

Surveillance video from the liquor store from July 22 viewed by police showed Johnson and Brambila come into the liquor store and defendant come in as they were leaving. Video showed defendant's car parked in front of the liquor store window. In the video, defendant is wearing a hat found in Johnson's shed and glasses. According to the police officer who viewed the video, defendant's movements in the video were consistent with a person being under the influence of a stimulant such as methamphetamine.

After leaving the liquor store, Brambila, Johnson and defendant parked by a traffic school a block away. Johnson was in defendant's car, because they wanted to have a conversation. The owner of the traffic school yelled at them to leave. Brambila went back to the house and had the drinks. Johnson went back to the part of the property where his shed was. Twenty minutes later, Johnson came up from the shed to smoke a cigarette. Johnson went into the house. Defendant was there for 10 to 15 minutes and walked away.

Police viewed surveillance video from July 23, 2019, from a house across the street from the property where Johnson was found dead. The video showed a light-colored, four-door vehicle driving by at 1:13 a.m. towards the property, driving the other way an hour and a half later, and driving the original direction again 20 minutes later.

4

The vehicle was the same one that defendant was shown parking in the video of the liquor store. The license plate number was registered to defendant.

Hunt was not at the house at the time Johnson was found dead in the shed. He did not hear about it until later that night. The last time Hunt saw Johnson alive was around 6:00 p.m. the day before, when Johnson had a party with about six people in the shed.

Another resident of the house, John Rhodes, went to the shed to listen to music with Johnson that night and returned to his room in the house within an hour. He stayed in his room the whole night. A friend Rhodes referred as "Kathryn" visited him that night with defendant (her son) and spent time in Rhodes' room. Defendant left and Kathryn stayed for about two hours. Defendant came back, looking like he was strung out on some kind of drug. Kathryn left and came back in two or three hours.

When Rhodes woke up in the morning, Ed told him something was wrong with Johnson. Rhodes told Kathryn to go check on Johnson but she was very hesitant.

On July 22, 2019, Hunt went to bed at 11:00 p.m. and woke up around 2:30 a.m. when he heard someone coming through the gate by his bedroom window. He shined a flashlight out the window. Hunt saw Kathleen McHatton, a friend of Johnson's, passing through the yard. He went back to sleep but woke up shortly afterwards when he heard someone run into his tree. Hunt looked out and saw a man coming up from Johnson's shed, struggling to keep his balance. He appeared to be lost. He had shorts and shoes on and a shirt in his hand. Hunt told him to get the hell out of there. The person ran into the gate, fell over the barbeque on the sidewalk, said, Lord help me, and then left.

Hunt did not know who the person was at the time. Later he saw defendant in a photo with Kathleen McHatton and recognized him as the person Hunt yelled at in the yard. Once Hunt made the connection between them as mother and son, Hunt knew who defendant was. Kathleen McHatton introduced defendant to Hunt on the night of Johnson's party.

5

The morning of the day Johnson was found dead, Ronald Brooks encountered defendant at a house that Brooks rented with others in Redding, including Dave Fruits whose mother owned the house. Kathleen McHatton was a frequent visitor. Brooks knew defendant. Brooks had gambled at a casino with defendant the night before. Brooks saw defendant at his house early that morning. Defendant was in the hallway; he had just gotten out of the shower. He had never taken a shower there before. Defendant was wearing Brooks' clothes. Brooks asked why, but defendant was mumbling and Brooks could not understand him. Defendant seemed agitated.

Ten minutes later, Brooks was taking the garbage out and defendant followed him, still acting agitated. Defendant said that "he jacked this guy up and the guy bode up on him and he had to take him out." Brooks understood "jack this guy up" to mean "[c]omforted [*sic*] him about something and a guy didn't like it too much so he, you know, confronted him back and turned into something more than it should have been." Brooks understood that defendant said "take him out" to mean kill him. Brooks did not want to get involved and told defendant to leave. Defendant stayed in the house. Defendant had locked his keys in his car. Defendant and Fruits went out to unlock the car.

David Horn lived across the street from the house where Brooks lived. Horn knew Kathleen McHatton, her daughter Ashley McHatton, and her younger brother, defendant. Defendant lived at Horn's house for two months in the spring of 2019. Horn asked defendant to leave because of a "difference in lifestyle."

Police located defendant at 11:30 p.m. on July 23, 2019, at the house where Ashley McHatton lived, and arrested him in the early morning hours of July 24. Police searched Ashley's bedroom and collected a cell phone from the bed. The screen was cracked and what appeared to be dried blood was in the corners and on the back side of the phone. Before the arrest, police corporal Robert Garnero spotted Kathleen McHatton

6

walking down the street and detained her for questioning.[2]  Defendant's car, a silver or gold Chevy Prism, was parked at Horn's house across the street.  Garnero noticed that all the windows of the car appeared to be wiped down.  Garnero and another police investigator noted red stains and smears around the bottom of the steering wheel and on the dashboard and glove compartment.  Police towed the vehicle to process it for evidence.

Corporal Garnero interviewed defendant.  Defendant had scrapes and cuts to his hands and elbow, as well as scrapes on his right triceps and lower left abdomen and abrasions on his sternum and right hip.  An officer collected DNA samples from defendant.

The day after Johnson's body was discovered, an officer obtained a photo of defendant from Ashley McHatton's cell phone.  In the photo, defendant is wearing a black Vans hat and glasses.  Based on the photo, police determined that the glasses recovered from under Johnson's body belonged to defendant.  The same hat appears in photos of the crime scene.  The hat was collected by police from a pool of blood.

A forensic pathologist conducted an autopsy of Johnson.  The pathologist opined that the cause of death was blunt head trauma.  Johnson had blunt force injuries to his head, primarily to the right side of his face.  He had fractures of the bridge of his nose, his right cheek, and the maxillary bone that includes the upper teeth, consistent with blunt force trauma.  The injuries to Johnson's face were consistent with multiple blows.

The left side of the hyoid bone at the top of Johnson's neck was fractured.  Johnson had seven lacerations to the back of his head that had features of blunt force trauma.  One laceration was deeper, resulting in a large hole in the skull and a bone

[2]  In a search on August 6, 2019, police found a pair of black Vans shoes with checkered patterned soles in a plastic bag in Kathleen McHatton's possession.  The shoes were wrapped in towels and had orange discoloration markings similar to bleach stains.

fragment being jammed into the brain tissue, causing brain damage. This injury is commonly seen with injuries inflicted by tools, such as a hammer, and was likely fatal. The lacerations on the back of Johnson's head were consistent with multiple impacts.

Test of a blood sample from Johnson showed a fairly high level of methamphetamine. The pathologist excluded methamphetamine as a cause of death, but it probably affected Johnson's behavior prior to death.

A senior criminalist with California's Department of Justice testified that DNA profiles were created from reference samples of swabs taken from defendant's mouth and a bloodstain from Johnson. Samples taken from the floorboard of defendant's car, the outer portion of the left Vans shoe, the mid-sole of the right shoe, the blood on defendant's cell phone, the Vans hat, the head of the hammer, and the four-by-four piece of wood showed Johnson as the likely sole or primary contributor. DNA samples from the grip of the hammer strongly indicated both Johnson and defendant as contributors.

## B.     Defendant's case

Defendant testified.

Defendant knew Johnson as a friend of his mother, Kathleen McHatton. Johnson lived in a shed in back of Hunt's house. Defendant started going to Hunt's house towards the end of June 2019. He spent time with Johnson in his shed three or four times.

Prior to July 22, 2019, defendant had been living at Horn's house for about two and a half months. Defendant had relapsed from methamphetamine use after four years clean, and, on July 22, Horn asked him to leave. Defendant had been a methamphetamine user for 14 years off and on. Defendant did not leave right away because he was looking for a place to go.

On July 22, defendant saw Johnson at the liquor store with Brambila. Defendant was coming down from methamphetamine at the time. Defendant left alone, but met around back with Johnson, and they had a conversation in defendant's car. Defendant took Johnson back to Hunt's property. Then defendant went back to Horn's house.

8

Defendant contacted Johnson later when he was looking for his mother at Hunt's house. Defendant called Johnson on his cell phone at around midnight to check to see if his mother was at Hunt's house. Johnson said she was there. Defendant asked if Johnson was still up and if defendant could come over. Defendant went to Johnson's place. As shown in surveillance video, defendant went to Hunt's property at about 1:13 a.m. and left the property at about 2:43 in the morning. Defendant and Johnson had been listening to music and then they went to a convenience store. Johnson bought a drink and they went back to Hunt's house at about 3:03 in the morning, as shown in surveillance video.

Defendant told Johnson he needed to sober up and asked if Johnson would give him some bedding. Johnson gave him a couple pillows and a sleeping bag. Defendant fell asleep on a large chair.

Defendant woke up when he felt something like a pressure below his waist. He saw Johnson with his mouth on defendant's penis and his hand on defendant's testicles. Defendant was wearing just shorts and shoes when he went to sleep. When he woke, his shorts were pulled down below his waist and his genitals exposed. Defendant's body flinched. He cursed. Johnson pulled his head back. He was either on his knees or crouched over defendant.

With his right hand, defendant punched Johnson's face. Defendant felt like he was "being violated" and "was just oblivious to why -- why that was happening." Johnson fell back. Defendant pulled up his shorts. Then Johnson punched defendant on the left side of the head. Defendant fell back into the chair and kicked Johnson, pushing him back towards the door of the bathroom under construction. Johnson came back out with a piece of wood in his hand and swung it at defendant. Johnson missed because defendant moved to the side. Defendant pushed Johnson with his shoulder. Defendant went to the shed door to exit the shed. Inside the shed door was a bracket that held a hammer. The shed had no lock and the hammer in the bracket was used to lock the shed from the inside. To get it out, the hammer had to be pulled out of the bracket.

9

Defendant attempted to leave the shed because he was "scared for my life." He testified, "I mean, it was -- it was all the shock. This all happened really fast. And, you know -- you know, being violated and then having -- had that swung at my head I was scared for my life." Defendant was scared that if he stayed in the shed he would have been knocked out and unable to defend himself. Defendant testified that "[Johnson] was acting scary . . . ." Defendant was afraid "[Johnson] would have kept going or not stopped. . . . He had already swung it at me and violated me while I was asleep. And all kinds of things were running through my head, you know."

Defendant grabbed the hammer to open the door. Defendant felt panic that Johnson was going to come back at him with the board. Defendant heard noises behind him like Johnson was approaching. Defendant pulled the hammer out, turned around and hit Johnson on the head with it. Defendant hit Johnson multiple times in quick succession. Johnson fell to the ground.

Defendant checked Johnson's head. Defendant didn't intend to hurt Johnson but only to get him to stop. Johnson was his friend. Johnson was unconscious and bleeding. Defendant did not want Johnson to die. Defendant went into the loft to find something to stop the bleeding. Defendant got a shirt or rag or towel and wrapped it around Johnson's head.

In a panic, defendant decided to leave the shed to get help. He was screaming the word help. Defendant headed up towards the house. Defendant wasn't able to think clearly; he was just able to think he needed help. He stumbled into something in the backyard of the house and made a loud noise, which got somebody's attention. Someone said the cops are on their way in a loud voice. Defendant thought that law enforcement would arrive and take care of Johnson.

Defendant did not stick around to make sure Johnson was okay or to speak to law enforcement. He went to his car and ended up driving to Fruits' house. Defendant's vehicle is a gold Chevy Prism. Defendant showered and changed his clothes; he didn't

10

know why. He left his clothes and shoes on the porch. Defendant left the hat he was wearing and his glasses in the shed. Defendant was wearing the black Vans shoes found in the shed. He did not know what caused the discoloration on the shoes.

When defendant left Fruits' house, he went to the house where Ashley McHatton lived nearby. She brought him in the house. He went to her bedroom and fell asleep. Defendant was arrested there.

Defendant did not take any steps to clean his car before he was arrested. Defendant did not know how Kathleen McHatton got his Vans shoes. He did not give them to her.

After defendant was arrested and being processed, he was told he was being charged with murder.

On cross-examination, defendant testified that he knew Johnson was gay.

## III. Verdict

The jury found defendant guilty of second degree murder and found true the allegation that defendant used a deadly weapon. Defendant was found not guilty of destroying evidence.

## IV. Sentence and Appeal

The trial court sentenced defendant to 15 years to life for second degree murder plus one year for the deadly weapon use to be served consecutively. The court ordered defendant to pay a $10,000 restitution fine (§ 1202.4, subd. (b)(1)), an additional restitution fine of $10,000 that the court suspended unless defendant's parole was revoked (§ 1202.45, subd. (a)), a court operations assessment of $40 (§ 1465.8, subd. (a)(1)), and a criminal conviction assessment fee of $30 (Gov. Code, § 70373).

Defendant filed a timely appeal.

11

*CALCRIM No. 570*

Defendant contends that "the trial court's instruction, pursuant to CALCRIM No. 570, that a 'non-violent' sexual advance was not objectively reasonable provocation to reduce the homicide to voluntary manslaughter was inapplicable to the facts of [defendant's] case." Defendant argues he "was the victim of a sexual assault . . . not a 'non-violent' sexual advance."

Defendant refers to the court's decision to modify CALCRIM No. 570, the pattern instruction on manslaughter in a heat of passion, to add language derived from section 192, subdivision (f).[3] We agree the trial court erred. Based on evidence presented at trial, this provision by its terms was inapplicable. CALCRIM No. 570 should not have been modified to incorporate the statutory language. We further conclude that the error was prejudicial and requires reversal and remand.

"Manslaughter is a lesser included offense of murder. [Citations.] The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a

---

[3] Section 192, subdivision (f), provides:

"(1) For purposes of determining sudden quarrel or heat of passion pursuant to subdivision (a), the provocation was not objectively reasonable if it resulted from the discovery of, knowledge about, or potential disclosure of the victim's actual or perceived gender, gender identity, gender expression, or sexual orientation, including under circumstances in which the victim made an unwanted nonforcible romantic or sexual advance towards the defendant, or if the defendant and victim dated or had a romantic or sexual relationship. Nothing in this section shall preclude the jury from considering all relevant facts to determine whether the defendant was in fact provoked for purposes of establishing subjective provocation.

"(2) For purposes of this subdivision, 'gender' includes a person's gender identity and gender-related appearance and behavior regardless of whether that appearance or behavior is associated with the person's gender as determined at birth."

mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.  Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*).)

" 'Heat of passion has both objective and subjective components.  Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  [Citation.] . . . [Citation.] [¶]  Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.  [Citation.]' " (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)

"For purposes of the heat of passion doctrine, 'provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection.  A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment.' [Citation.]  The standard requires more than evidence that a defendant's passions were aroused.  The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 539; see also *People v. Wang* (2020) 46 Cal.App.5th 1055, 1069.)

Defense counsel objected to the court's modification of CALCRIM No. 570, arguing that there was no evidence that defendant acted the way he did because of disclosure of Johnson's sexual orientation.  Counsel pointed out that defendant knew Johnson was gay.  He also argued there was no evidence that Johnson made an unwanted, nonforcible sexual advance; it was a sexual assault.  Counsel maintained that the modified instruction would burden the defense with having to explain away Johnson's sexual orientation, which was not related to defendant's actions.

13

The prosecution responded that the modification was necessary because jurors in the county might think "that if one were subject to a sexual advance or sexual proposition from an individual of the same sex, that it would be justifi[cation] to react violently."

The trial court adopted the prosecutor's argument, i.e., "there may be people in our society who still feel the sexual orientation, gender identity or expression, and the expression of that or the disclosure of that or the knowledge being gained of that may be adequate provocation," and "the law is clear that it is not." The court acknowledged defense counsel's argument but ruled that the modified instruction "is a correct statement of the law that the Court feels needs to be given," because "evidence was presented that the victim was gay . . . ."

The court instructed the jury as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked;

"2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote

14

provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"*A provocation is not objectively reasonable if it results from the discovery of, knowledge about, or potential disclosure of the victim's actual or perceived sexual orientation, including under circumstances in which the victim made an unwanted non-forcible romantic or sexual advance towards the defendant, or if the victim and defendant dated or had a romantic or sexual relationship. However, you may consider such evidence, if relevant, along with other relevant evidence in determining whether the defendant was in fact provoked.*

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

We conclude the court committed error. As defense counsel argued, the language taken from section 192, subdivision (f), and added to CALCRIM No. 570, did not apply based on the evidence at trial. Defendant testified he was not provoked by discovering Johnson was gay; defendant knew Johnson was gay.

Further, section 192, subdivision (f), did not apply because defendant testified that Johnson did not make an "advance." According to defendant, Johnson committed a

15

felonious act: oral copulation of a sleeping person. (§ 287, subd. (f).)[4] An "advance" is defined in Merriam-Webster's Collegiate Dictionary (11th ed. 2006) as "a first step or approach made," for example as in "her attitude discouraged all advances." (*Id.* at p. 18; see also Cambridge English Dict. Online (2021) <https://dictionary.cambridge.org/us/dictionary/english/advance [as of Dec. 20, 2021], archived at < https://perma.cc/G679-R2P6> ["an attempt to start a sexual or romantic relationship with someone: [¶] *She rejected his unwelcome advances*"]; Dictionary.com (2021) <https://www.dictionary.com/browse/advance> [as of Dec. 20, 2021], archived at < https://perma.cc/92ZF-45F6> ["actions or words intended to be sexually inviting"].) The instruction, however, did not define "advance," creating an ambiguity whether oral copulation of a sleeping person was an "advance" because it was nonforcible. (See *People v. Hernandez* (2011) 200 Cal.App.4th 1000, 1006 (*Hernandez*) [crime of rape of an unconscious person did not require "force or violence"].)

The policy justification for the statute is clear: "Subsection (f)(1) correctly focuses the factfinder's attention on whether the provocation resulted from the discovery of, knowledge about, or disclosure of the victim's gender, gender identity, gender expression, or sexual orientation. It makes sense to preclude the provocation defense in these cases since it is clearly unreasonable to lose one's self-control after learning that another person is gay or a transgender individual." (Lee, *The Trans Panic Defense Revisited* (2020) 57 Am. Crim. L.Rev. 1411, 1470.) "Subsection (f)(1) acknowledges that a defendant might have discovered that the victim was gay if the victim made an

---

[4] Section 287, subdivision (f), provides in relevant part: "Any person who commits an act of oral copulation, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act, shall be punished by imprisonment in the state prison for a period of three, six, or eight years. As used in this subdivision, 'unconscious of the nature of the act' means incapable of resisting because the victim meets one of the following conditions: [¶] (1) Was unconscious or asleep."

unwanted, non-forcible romantic or sexual advance toward the defendant. Likewise, the defendant might have discovered that the victim was a transgender woman in the course of a romantic or sexual relationship. The prohibition, however, only applies if the alleged provocation resulted from the *discovery of, knowledge about, or disclosure of* the victim's gender identity or sexual orientation." (*Ibid.*)

The discovery, knowledge or disclosure of the victim's sexual orientation element of section 192, subdivision (f), was absent here. Defendant's testimony was undisputed that he knew Johnson was gay before the night defendant slept in the shed.

We conclude that the inapposite language of section 192, subdivision (f)(1), inserted in CALCRIM No. 570, allowed jurors to find defendant guilty even if they believed a reasonable person would be provoked to violence by waking to find himself being orally copulated. " 'Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person.' [Citations.]" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1140 (*Millbrook*).) Here, the instruction effectively removed from the jury's consideration whether oral copulation of a sleeping person constituted provocation that would reduce murder to manslaughter.

Having concluded the trial court erred, we must determine whether the error was harmless. " ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" ' " in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Beltran, supra*, 56 Cal.4th at p. 955.) " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*Ibid.*)

"A reasonable probability 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. [Citations.]' [Citation.] An error is prejudicial whenever the defendant can ' "undermine confidence" ' in the result

17

achieved at trial. [Citations.] 'In assessing prejudice, we consider both the magnitude of the error and the closeness of the case.' [Citation.]" (*People v. Vasquez* (2018) 30 Cal.App.5th 786, 798.)

The Attorney General asserts "the evidence of [defendant's] guilt was strong while his claim of self-defense was weak." Assuming the Attorney General means evidence of provocation was weak, the magnitude of the error was great. Defendant's only theory of provocation was that he woke up to find Johnson orally copulating him and punched him because he felt "violated" by conduct that amounted to a felony, oral copulation of a sleeping person (§ 287, subd. (f)). In his testimony, defendant repeated three times that he felt "violated." In particular, defendant testified that feeling "violated" was one of the "things" that was "running through [his] head" when he grabbed the hammer. However, the court's modification of CALCRIM No. 570 instructed the jury that oral copulation could not be adequate provocation as a matter of law.

In addition, "[c]losing arguments to the jury are relevant in assessing prejudice from instructional error." (*People v. Hayes* (2009) 171 Cal.App.4th 549, 560.) The prosecutor highlighted the erroneous modification to CALCRIM No. 570 in closing argument. The prosecutor argued: "And then perhaps relevant to this case, there is a provision of the law that says provocation is not objectively reasonable. So the law makes a decision, provocation is not going to be reasonable objectively. In a situation where it results from basically information received about the victim's sexual orientation including situations in which the victim made an unwanted, non-forcible romantic or sexual advance. [¶] And the reason why this is here in the law, ladies and gentlemen, is because sometimes people might think that if somebody makes particularly a homosexual type of sexual advance or romantic overture towards somebody, that somebody might be lawfully justified in hurting them or killing them. And what the law says is that is not right. That's not objectively reasonable. Of course you have to look and see whether or not the other elements of sudden quarrel or heat of passion are met. It's not to say that

18

anytime someone is killed in this situation it's not voluntary manslaughter. [¶] But what this provision says is it is not objectively reasonable. So this idea of the reasonable man, the law is saying to you a reasonable man would not kill based on this provocation, based on sexual orientation."

The prosecutor's argument confused and misled the jury that defendant's claim of provocation was based on Johnson's sexual orientation and a mere sexual advance, neither of which was sufficient provocation to reduce murder to manslaughter under section 192, subdivision (f), incorporated in CALCRIM No. 570 by the court.

We conclude there was a reasonable chance that the jury would have found Johnson's oral copulation of defendant while he slept to be sufficient provocation to reduce murder to manslaughter, in the absence of the erroneous jury instruction and the prosecutor's closing argument relying on this erroneous instruction. (*Beltran, supra*, 56 Cal.4th at p. 955; *Millbrook, supra*, 222 Cal.App.4th at p. 1146.)

To be sure, defendant testified that he struck Johnson with a hammer in self-defense, a defense that the jury rejected in finding defendant guilty of second degree murder. But defendant's testimony that he felt violated was separate from his testimony that he feared that Johnson would hit him with the four-by-four, the basis of his claim of self-defense. The jury could have believed defendant was in the grip of an intense emotion that prevented reflection and deliberation after he woke up to find he was being orally copulated, even if the jury did not believe defendant was in fear for his life because Johnson was trying to hit him with a board studded with nails. (See *Millbrook, supra*, 222 Cal.App.4th at pp. 1147-1148 [rejecting argument that failure to give heat of passion instruction was harmless because jury rejected a finding of self-defense]; *In re Hampton* (2020) 48 Cal.App.5th 463, 482 [reasonable possibility the jury believed enough of the defendant's testimony to conclude that, while he did not kill in self-defense, his judgment was obscured by intense emotion such that he fired the gun without thinking, "acting from passion rather than judgment"].)

19

Thus, there was more than an abstract possibility that the jury would have found defendant guilty of the lesser included offense of voluntary manslaughter. (*Millbrook, supra*, 222 Cal.App.4th at p. 1147.)

We conclude that prejudicial instruction error requires reversal of the judgment. (*Millbrook, supra*, 222 Cal.App.4th at p. 1148.)

For the guidance of the parties and the court on remand, we address defendant's other claims of instructional error.

## II

### *CALCRIM No. 505 and CALJIC No. 5.10*

Defendant makes related claims that the trial court erred and violated his constitutional rights by (1) instructing the jury on perfect and imperfect self-defense with CALCRIM No. 505, without including a reference to self-defense to oral copulation and sodomy, and (2) failing to instruct the jury with CALJIC No. 5.10 that homicide is not unlawful when resisting a "forcible and atrocious" crime. We disagree.

In settling jury instructions, the court noted that defense counsel was looking into whether the optional "forcible and atrocious" language in CALCRIM No. 505 applied. CALCRIM No. 505, the pattern instruction on self-defense to homicide, contemplates modification of the instruction to include language regarding self-defense to a "forcible and atrocious" crime in the first element of the defense, to wit, "defendant reasonably believed that [he] . . . was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being (raped/maimed/robbed/<*insert other forcible and atrocious crime*>)] . . . ." (CALCRIM No. 505.)[5]

---

[5] The three elements of self-defense to homicide set forth in CALCRIM No. 505 are:
"1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] <*insert name or description of third party*>) was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being (raped/maimed/robbed/ <*insert other forcible and atrocious crime*>)];

Defense counsel requested that the court insert the crime of oral copulation of an unconscious person (§ 287, subd. (f)) as a forcible and atrocious crime, citing *People v. Ceballos* (1974) 12 Cal.3d 470, 478 (*Ceballos*). After counsel for the parties presented competing arguments to the court, defense counsel added that defendant was in fear of additional sexual assaults, which could have included sodomy, so sodomy should also be included as a forcible and atrocious crime in the instruction.

The court ruled that it is appropriate to instruct on a forcible and atrocious crime in CALCRIM No. 505 but not for the reasons or the crime proposed by the defense. The court reasoned that a forcible and atrocious crime must involve facts sufficient to create a reasonable fear of great bodily harm and imminent danger of a forcible and atrocious crime. The court concluded that "considering was there a forcible, atrocious crime such that the defendant was in reasonable fear of great bodily injury and was in imminent [peril] or imminent danger, I find that the sexual offense of oral copulation does not rise to that level. Both the Court finds it was not imminent to the acts upon which the defendant acted and resulted in the decedent's death. And it wasn't committed in a way that would reasonably create a fear of great bodily injury -- or great bodily harm rather." On the other hand, the court found that Johnson's swinging a board with nails in it at defendant's head was an assault that would be a felony likely to create a reasonable fear of great bodily harm.

Accordingly, the court instructed the jury on the first element of self-defense in CALCRIM No. 505 as follows: "The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent

---

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;
"AND
"3. The defendant used no more force than was reasonably necessary to defend against that danger."

danger of being assaulted with a deadly weapon or assaulted with force likely to produce great bodily injury . . . ."

We find no error.

Defendant testified to a sexual assault, not mere sexual overtures which do not support a self-defense claim. (*People v. Valencia* (2008) 43 Cal.4th 268, 286.) But self-defense to sexual assaults has been limited to forcible sexual assaults, i.e., rape. (*Ceballos, supra*, 12 Cal.3d at p. 478.) We are not aware of any reported California case deeming oral copulation of an unconscious person a forcible sexual assault and defendant has cited none.

Rather, defendant argues that the self-defense to homicide statute, section 197, subdivision (1), "does not limit the right to use deadly force to cases involving an 'imminent danger of being killed or suffering great bodily injury . . . .' " Quoting this provision, defendant maintains that "the section provides that self-defense applies when a defendant is 'resisting any attempt to murder any person, *or to commit a felony*, or to do some great bodily injury upon a person.' "

In *Ceballos*, the court rejected the argument that self-defense is applicable to resistance to the commission of any felony: "By its terms subdivision 1 of Penal Code section 197 appears to permit killing to prevent any 'felony,' but in view of the large number of felonies today and the inclusion of many that do not involve a danger of serious bodily harm, a literal reading of the section is undesirable. [Citations.]" (*Ceballos, supra*, 12 Cal.3d at pp. 477-478.) The court noted that *People v. Jones* (1961) 191 Cal.App.2d 478, 481, "stated that Penal Code section 197 'does no more than codify the common law and should be read in light of it.' *Jones* read into section 197, subdivision 1, the limitation that the felony be ' "some atrocious crime attempted to be committed by force." ' . . . 'We must look further into the character of the crime, and the manner of its perpetration [citation]. *When these do not reasonably create a fear of great bodily harm*, as they could not if defendant apprehended only a misdemeanor assault,

*there is no cause for the exaction of a human life*.' [Citations.]" (*Ceballos, supra*, at p. 478; see also *Jones, supra*, at p. 482 ["The language of statute (Pen. Code, § 197, subd. 1) . . . says that homicide is justifiable in resisting an attempt to murder, or to commit a felony, or to do some great bodily injury. By implication, the felony contemplated by the statute is one that is more dangerous than a personal assault"].)

Thus, "[e]xamples of forcible and atrocious crimes are murder, mayhem, rape and robbery. [Citations.] In such crimes 'from their atrocity and violence human life [or personal safety from great harm] either is, or is presumed to be in peril' [citations]." (*Ceballos, supra*, 12 Cal.3d at pp. 478-479.)

We note that section 287 includes separate provisions for oral copulation by force (subd. (c)(2)(A)) and oral copulation where the person is asleep, unconscious or intoxicated (subd. (f)), indicating that the latter does not involve force but "is related to the issue of consent." (*People v. Morales* (2013) 212 Cal.App.4th 583, 591; see also *People v. Giardino* (2000) 82 Cal.App.4th 454, 461, fn. 4 [while in a state of unconsciousness, "the victim not only lacks the capacity to give legal consent, he or she cannot possibly give actual consent"]; *Hernandez, supra*, 200 Cal.App.4th at p. 1006 ["[t]here is no requirement that the defendant use force or violence to accomplish the act of sexual intercourse" of an unconscious person].)

In any event, "a court need not give a requested instruction on a purported defense unless it is supported by evidence that is substantial, i.e., that the evidence that is reasonable, credible and of solid value." (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165, overruled on other grounds in *People v. Poisson* (2016) 246 Cal.App.4th 121, 125.) In *Quintero*, the defendant testified that the victim pushed the defendant's head towards the victim's genital area, and when he would not let go, the defendant became angry and slashed the victim's face. (*Quintero, supra*, at p. 1160.) The defendant requested an instruction on imperfect self-defense to the charge of mayhem. (*Id.* at p. 1164.) The court affirmed the trial court's finding that there was no substantial

23

evidence to support the instruction.  (*Id.* at pp. 1165-1166.)  "Although [the defendant] testified he was scared, angry and offended by [the victim's] alleged sexual advances and fought to have [the victim] release his hands from holding his head down toward his lap, [defendant] did not say [the victim] ever struck or threatened him, or that he believed he was imminently in harm's way."  (*Id.* at p. 1165.)

Here, defendant testified that he felt "violated" when he woke up to find Johnson orally copulating him.  But defendant said nothing about fear of imminent harm from oral copulation.  Rather, he testified he was in fear of his life from Johnson swinging a piece of wood at him.  As in *Quintero*, there was no substantial evidence to support including oral copulation in CALCRIM No. 505.

The Attorney General argues that defendant forfeited his other claims of instructional error on self-defense, i.e., defendant's contentions that the trial court erred by failing (1) to instruct on self-defense to sodomy and (2) to include the "forcible and atrocious" crimes of oral copulation and sodomy in the instruction on imperfect self-defense, CALCRIM No. 571.  We agree.  Moreover, there was no substantial evidence to support giving the jury an instruction on imperfect self-defense to oral copulation or sodomy or self-defense to sodomy generally.

Defense counsel did request inclusion of sodomy in CALCRIM No. 505, albeit as an afterthought, and the trial court did not discuss sodomy in ruling on defendant's requested modification to the instruction.  The Attorney General argues that defendant forfeited the issue by failing to "press" for a ruling on sodomy.  We agree.  "In order to preserve an issue for review, a [party] must not only request the court to act, but must press for a ruling.  The failure to do so forfeits the claim.  [Citations.]"  (*People v. Ramirez* (2006) 39 Cal.4th 398, 472-473; see also *People v. Homick* (2012) 55 Cal.4th 816, 871.)

Assuming that this claim was not forfeited, we note that in *People v. Collins* (1961) 189 Cal.App.2d 575, the court treated forcible sodomy as a sufficient felony for

24

purposes of self-defense. (*Id.* at pp. 589-593.) In *Collins*, the prosecution presented evidence that the smaller defendant was resisting a forcible sodomy attack by the larger and more powerful victim, and that the defendant was afraid of the attacker and afraid of being sodomized. (*Ibid.*) Specifically, the victim had sodomized defendant previously and was on that occasion using his legs to trap defendant in a "scissors grip" around the waist. (*Id.* at pp. 579, 589-590) Defendant hit the victim with a wine bottle multiple times until the victim's legs relaxed. (*Id.* at p. 590.)

No such evidence exists here to support a reference to sodomy in CALCRIM No. 505 (or CALCRIM No. 571). Defendant did not testify that he was resisting Johnson who was physically attempting to commit sodomy by force. Indeed, defendant never mentioned sodomy or fear of imminent danger of being sodomized in his testimony. Defendant did not state he felt any fear of danger until Johnson swung at him with the piece of wood. Under the circumstances, there was no substantial evidence to support the need for an instruction on perfect or imperfect self-defense to sodomy.

While the court instructed the jury with CALCRIM No. 571 on imperfect self-defense, defendant failed to request that this instruction include self-defense to oral copulation or sodomy. The discussion by counsel for the parties and the ruling by the court regarding "forcible and atrocious" crime dealt with CALCRIM No. 505 only. Defendant thus forfeited any claim of error. (See *People v. Jackson* (2016) 1 Cal.5th 269, 336 (*Jackson*) [" 'A trial court has no sua sponte duty to revise or improve upon an accurate statement of the law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal' "]; *People v. Garcia* (2020) 46 Cal.App.5th 123, 154 (*Garcia*); see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1233 [where there was no discussion of a proposed instruction, defendant forfeited claim that trial court erroneously refused it].)

Again assuming that defendant did not forfeit the claim, there was no substantial evidence to support an instruction on imperfect self-defense for the same reasons as for

25

perfect self-defense. " 'For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter. [Citation.] . . . [Citations.] . . . [F]or either perfect or imperfect self-defense, the fear must be of imminent harm.' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 72, quoting *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

Defendant testified he killed Johnson in response to the assault with the board, which made him fear for his life. While defendant testified he felt "violated" waking up to find Johnson orally copulating him, he did not report that he felt any fear of imminent harm as a result. Moreover, oral copulation of an unconscious person does not constitute a forcible sexual assault sufficient to warrant a reasonable or unreasonable belief in the need to defend against imminent harm. (See *Hernandez, supra*, 200 Cal.App.4th at p. 1006.)

Finally, defendant claims that the trial court erred in failing to instruct the jury with CALJIC No. 5.10. CALJIC No. 5.10 states: "Homicide is justifiable and not unlawful when committed by any person who is resisting an attempt to commit a forcible and atrocious crime."

Defendant also forfeited the issue by failing to request CALJIC No. 5.10 below, which, given the fact that the court did give CALCRIM Nos. 505 and 571 on self-defense, would have amounted to request for clarification of those instructions. (See *Jackson, supra*, 1 Cal.5th 269 at p. 336; *Garcia, supra*, 46 Cal.App.5th at p. 154; see also *People v. Barillas* (1996) 49 Cal.App.4th 1012, 1023 (*Barillas*).)

Moreover, because the court correctly instructed the jury on self-defense, CALJIC No. 5.10 was surplusage. In *Barillas*, the trial court gave CALJIC No. 5.10, and on appeal the defendant claimed prejudicial error because the court did not also give CALJIC No. 5.16 defining "forcible and atrocious." (*Barillas, supra*, 49 Cal.App.4th at

26

p. 1023 & fn. 9.)[6] *Barillas* rejected the claim noting that the trial court gave multiple instructions defining self-defense besides CALJIC No. 5.10. (*Barillas, supra*, at p. 1023.) *Barillas* dismissed CALJIC No. 5.10 as "surplusage, [which] added nothing to the other instructions, and should not have been given." (*Barillas, supra*, at p. 1023.)[7]

## DISPOSITION

The judgment is reversed.

/s/
RAYE, P. J.

We concur:

/s/
MURRAY, J.

/s/
HOCH, J.

---

[6] "The instruction reads: '[A forcible and atrocious crime, as the term is used in these instructions, is any felony, the character and manner of the commission of which threatens, or is reasonably believed by the defendant to threaten, life or great bodily injury so as to instill in [him] [her] a reasonable fear of death or great bodily injury. [¶] [Murder] [Mayhem] [Rape] [Robbery] is a forcible and atrocious crime.]' " (*Barillas, supra*, 49 Cal.App.4th at p. 1023, fn. 9.)

[7] The *Barillas* court referred to the term "atrocious" as "antiquated." (*Barillas, supra*, 49 Cal.App.4th at p. 1023.)